## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**DAVID A. STEBBINS**                                **PLAINTIFF**

JUL 1 5 2015

**VS**                 CASE NO. 4:15cv436-JLH          JAMES W. McCORMACK, CLERK
By:
                                                                    DEP CLERK

**JIMM HANNAH, DONNA GAY, STATE OF
ARKANSAS, ARKANSAS ADMINISTRATIVE
OFFICE OF THE COURTS, RUSSELL ROGERS,          DEFENDANTS
DAVID D. STEBBINS, JAMES GOLDIE,**        This case assigned to District Judge _Holmes_
**AND KRISTIE WILLIAMS**                  and to Magistrate Judge _Kearney_

### COMPLAINT AND JURY DEMAND

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following

Complaint against the above-mentioned persons.

1.      Plaintiff alleges thirteen (13) causes of action:  First, an act of unlawful retaliation in

violation of Section 503 of the Americans with Disabilities Act.  Second, an act of unlawful

discrimination in violation of Title II of the Americans with Disabilities Act. Third and fourth,

invoking the federal court's supplemental jurisdiction, Plaintiff is suing Russel Rogers, in his

*personal* capacity (as opposed to his judicial capacity) for the common law torts of malicious

prosecution and defamation. Fifth, that James E. Goldie (acting as counsel for David D.

Stebbins) corroborated with Russell Rogers behind Plaintiff's back in order to rig the outcome of

our state court case in their favor, thus violating Plaintiff's constitutional right to an impartial

judiciary[1].

2.      Also, since Goldie and David D. Stebbins are both listed as Defendants, we might as well

bring all possible causes of action against those two.  Therefore, invoking this Court's

supplemental jurisdiciton, Plaintiff sues Goldie and David D. Stebbins for two (2) counts of

---

[1]   Russell Rogers and the State of arkansas NOT Defendants in that cause of action, because of Judicial and 11th
      Amendment immunities, respectively  They are only listed because of the ADA retaliation, for which there is no
      immunity; see Tennessee v. Lane, 541 US 509 (2004).

perjury, and David D. Stebbins for five (5) additional of perjury (and yes, that is a perfectly valid *civil* cause of action, under Arkansas state[2] law; see Section II, Sub-Section 7 of this Complaint, for details), as well as for one (1) count of tampering with physical evidence.

## SECTION I: FACTUAL ALLEGATIONS

### Sub-Section 1: Plaintiff's Litigation History

3.　　Plaintiff- a resident of the city of Harrison, Arkansas and of Boone County, Arkansas - has Asperger Syndrome, a disability which severely hinders his ability to socialize with others, make friends, get jobs, get a girlfriend, etc.

4.　　Because this disability is not obvious (like blindness or paraplegia), many persons do not realize that it even IS a disability, and thus, they believe that they have no obligation under the Americans with Disabilities Act to provide reasonable accommodations for it. This leads to many times when Plaintiff does not get the reasonable accommodations he is supposed to be legally entitled to. Thus, Plaintiff was faced, many many times, with two options: Either suck it up and let people do whatever they want to him and walk all over him, or file suit in federal court. Plaintiff quickly decided that the former was 100% out of the question.

5.　　Plaintiff could not afford to hire an attorney on an hourly basis, and because discrimination is an extremely complication area of law (indeed, the Defendant's mindset is an essential element), it is extremely rare for an attorney to take a case on contingency, especially when the Defendants in those cases honestly believe that they were doing nothing wrong.

6.　　Thus, Plaintiff had no choice but to represent himself *pro se* in these matters.

7.　　A list of the ADA cases where Plaintiff represented himself are …

　　(a)　　Case No. 10-3305 in the U.S. District Court for the Western District of Missouri;

---

2　Because remember: This is SUPPLEMENTAL jurisdiction

(b)   Case No. 10-3041 in the U. S. District Court for the Western Distria of Arkansas;

(c)   Case No. 10-5025 in the U.S. District Court for the Western District of Arkansas;

(d)   Case No. 10-3086 in the U.S. District Court for the Western District of Arkansas;

(e)   Case No. 10-3072 in the U. S. District Court for the Western District of Arkansas;

Case No. 11-3078 in the U.S. District Court for the Western District of Arkansas;

(f)   Case No. 11-3057 in the U.S. District Court for the Western District of Arkansas;

### Sub-Section 2:  The Adverse Action from James E. Goldie

8.     Plaintiff was suing David D. Stebbins in the Boone County Circuit Court for six torts, including, but not limited to, malicious prosecution, for making up evidence of a knife attack in order to have Plaintiff arrested, so he would not go to jail himself for punching Plaintiff in the face.

9.     During these proceedings, the Defense Attorney – one James E. Goldie by name – filed a Motion to Dismiss Plaintiff's Complaint, on the grounds that Plaintiff had filed multiple lawsuits in the past, and therefore, Plaintiff should not enjoy the constitutional right to court access.

10.    It was until April 23, 2015, when Plaintiff ultimately lost his case, that Plaintiff actually suffered damages as a result of this adverse action.

### Sub-Section 3: The Numerous Adverse Actions from Russel Rogers

11.    Russel Rogers was appointed as a special judge in the state court action on October 7, 2014. He was appointed by co-Defendants Jim Hannah (in his official capacity as Director of the Arkansas Administrative Office of the Courts). Since then, Donna Gay has freely admitted that she (and, by proxy, the entire Administrative Office of the Courts) does absolutely nothing to ensure that the judges they assign are qualified, in any way.

12.    Since being assigned, Russel Rogers made his disdain for Plaintiff clear.  He issued a

variety of adverse rulings that, in most circumstances, would be protected by judicial immunity, including, but not limited to, the following:

- He denied Plaintiff's "Motion to Always Read the Law in Future Motions." This motion was designed to ensure that whichever judge got assigned to Plaintiff's case would actually FOLLOW the law, and not use his judicial immunity to his advantage. Although Plaintiff suffered no prejudice, just on this alone, it set the stage for everything else to come.

- He dismissed, with prejudice, five of Plaintiff's seven claims. There was no motion to dismiss pending, and he never even ATTEMPTED to give any grounds for why they were being dismissed. He was dismissing them because … he did not think Plaintiff deserved his day in court. He wasn't even PRETENDING like it was more than that.

- He denied Plaintiff his right to discovery, simply on the grounds that Plaintiff's discovery requests were "confusing" and "unlikely to lead to admissible evidence." He never explained his decisions, or attempted to talk to Plaintiff about the alleged confusions.

- He denied Plaintiff's motions for summary judgment, claiming that the facts were still disputed, when the Defendant had admitted to said facts in response to a Request for Admissions.

- He declined to rule on the admissibility of any evidence until jury trial. This caused potentially inadmissible evidence to still be heard by the jury. He did this, simply out of a desire to ensure that Plaintiff had as difficult a time as possible

- Right before the jury trial (which, for the record, he forced Plaintiff into before Plaintiff had enough time to prepare), when a witness had not appeared, even though he never moved to quash his subpoena, he declined to send out a search party for that person,

simply on the grounds that he personally did not consider this witness's testimony to be
necessary. In other words, he was usurping the position of "Plaintiff's counsel" and
deciding litigation strategy on Plaintiff's behalf.

- Speaking of trying to decide litigation strategy on Plaintiff's behalf, when the trial got
  underway, and when Plaintiff was giving his own direct examination, he allowed the
  Defense Counsel (named Jim Goldie) to constantly interrupt Plaintiff's testimony and try
  to develop Plaintiff's testimony for him. He consistently tried to suggest evidence that
  Plaintiff should testify about, rather than waiting for his turn to conduct cross-
  examination. Judge Rogers allowed this, despite Plaintiff's protests, and specifically
  BECAUSE it prejudice Plaintiff.

- Also during trial, he repeatedly allowed the Defense Counsel to introduce clearly
  inadmissible evidence (such as hearsay evidence, evidence of prior acts that Plaintiff
  allegedly did, etc.) simply on the grounds that Plaintiff had already introduced these
  exhibits at some point in the litigation. The Judge offered this evidence in direct
  violation of Arkansas Rule of Evidence 105 ("Whenever evidence which is admissible as
  to one [1] party or for one [1] purpose but not admissible as to another party or for
  another purpose is admitted, the court, upon request, shall restrict the evidence to its
  proper scope and instruct the jury accordingly").

  ○ Perhaps the worst example of this came during Day 2 of the trial. When conducting
    direct examination of the Defendant himself, the Defense Attorney used the forensics
    report that Plaintiff introduced to show evidence that somebody – who wasn't even
    called as a witness at that trial – had told somebody else, over the phone, that Plaintiff
    had acted in a way that person considered to be excessively violent, and for that

matter, did not even give any specific instances of conduct, only that Plaintiff was violent with that person.  What was already heavily opinionated and conclusory was made even more inadmissible by the fact that it was not merely hearsay, but hearsay within hearsay.

○ Another good example came during Plaintiff's cross examination.  When his attempts to get Plaintiff to testify to the University of Arkansas' hearsay accusations that Plaintiff had formulated some "grand scheme" to murder his father four years in the making, he brought it up on cross examination.  Plaintiff objected to this evidence on the grounds that A) it was hearsay, and B) it was inadmissible under ARE Rule 404(b)[3].  At first, Goldie asked Plaintiff to simply admit that it was there, "whether it's true or not," suggesting that he had some other plans for this evidence, beyond simply to prove the truth of the matter asserted.  However, later in that trial, when Plaintiff was trying to introduce some similar evidence, Goldie freely admitted that he introduced that evidence for the express purpose of showing that the Plaintiff held a vendetta against the Defendant, meaning that he introduced the hearsay evidence for the purpose of proving the truth of the matter asserted.

○ All the while, in all the times the Defense Counsel did this, he never even so much as ATTEMPTED to offer any evidence that any one of these hearsay accusations were true.  The Defense Attorney's only argument for being allowed to show this evidence was "HE brought it up!" His argument was that, if Plaintiff introduces an exhibit for one purpose, then the Defense Attorney is allowed to use that exhibit for whatever purpose he likes, even if it would be inadmissible for that purpose otherwise.

---

3  Evidence of prior bad acts is inadmissible to show that Plaintiff acted in accordance therewith on a particular occasion.

Moreover, he spoke as if this was well-established law; like it was common knowledge among legal circles, and that anyone who had a legal education regarded this legal doctrine as second-nature.  Quite frankly, Rule of Evidence 105 says the complete opposite.

***BEFORE WE CONTINUE, THE COURT IS RESPECTFULLY REMINDED THAT THIS CASE IS NOT ABOUT WHETHER THE SPECIAL JUDGE ACTED APPROPRIATELY, BUT RATHER, WHETHER THE TWO DEFENDANTS ACTED UNLAWFULLY IN FAILING TO ASSIGN A JUDGE WHO WOULD ACT APPROPRIATELY.  WHETHER PLAINTIFF WAS, IN FACT, INJURED BY THERI FAILURE IS A QUESTION OF FACT, NOT A QUESTION OF LAW.  THEREFORE, THIS COURT NEED NOT CONDUCT ANY ANALYSIS INTO STATE LAW; THAT WILL BE THE JURY'S DECISION.***

- The Defense Attorney objected to numerous exhibits that Plaintiff attempted to introduce. However, he did not state any grounds for why the evidence should be inadmissible. Instead, he argued that the evidence did not prove what Plaintiff claimed it to prove.  He then asked the Court – not the jury, but the Court – to decide which side the evidence favored. This was a clear abuse of judicial authority.  By the judge's own admission, when it was instructing the jury on the law, it is the JURY'S job, not the judge's, to determine the weight of the evidence.
  - Plaintiff was most heavily prejudiced on this matter when he attempted to introduce written threats made by the Defendant – either the Defendant himself, or through counsel – threatening to collaborate with the government to deny Plaintiff access to the courts.  The Defense Attorney offered his own take on the matter, and the Court simply decided that, since he personally did not believe that the letters proved what Plaintiff offered them to prove, the jury was not going to get the opportunity to disagree with it.

- Despite all of this, the Defendant himself (as opposed to, the Defense Counsel) actually

ADMITTED to every single underlying fact that was necessary to support the two claims that remained. Despite this admission, Rogers refused to grant Plaintiff's Motion for Directed Verdict, simply calling it a "fact question," even though, you know, the Defendant ADMITTED TO IT! He never even attempted to explain his ruling beyond that. It was a fact question; just shut up and accept the Judge's biased decision like a little punk.

13.     As you can clearly see, Plaintiff has suffered numerous adverse actions. Thus, if these adverse actions can be shown to have been caused, at least in part, by Plaintiff's ADA litigation history, then they amount to unlawful retaliation in violation of Section 503 of the Americans with Disabilities Act.

### Sub-Section 3: Perjury No. 1 (Lying about lack of memory of night of arrest)

14.     During the discovery of the state court action, Plaintiff submitted a request for admissions to James E. Goldie, in his official capacity as defense counsel for David D. Stebbins. This interrogatory asked David D. Stebbins to admit to the precise chronological order of events that happened the night Plaintiff was arrested.

15.     This was material to the proceedings at the time because, at the time, the special judge had not *sua sponte* dismissed Plaintiff's malicious prosecution claim (see , and the precise chronological order of the events surrounding Plaintiff's arrest was relevant to proving lack of probable cause[4].

16.     Goldie, answering on behalf of David D. Stebbins, simply replied and stated "Defendant cannot state the exact order of events."

---

4   See Kuehl v. Burtis, 173 F. 3d 646, 650 (8th Cir. 1999): "[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as 'law enforcement would not [be] unduly hampered . . if the agents . . wait to obtain more facts before seeking to arrest.'"

17.     Plaintiff simultaneously served the Defendant with an Interrogatory, asking the Defendant to state, under oath, which of his answer to the request for admissions were true. This was designed to ensure that his answers were given under penalty of perjury. Goldie – acting on behalf of David D. Stebbins – replied and stated "all responses are true."

18.     However, when the jury trial actually got underway, the Defendant testified and stated the exact order of events, precisely as Plaintiff asked the Defendant to admit in the request for admissions, creating an inconsistency with his previous, under-oath response to his interrogatory.

### Sub-Section 4: Perjury No. 2 (Lying about Plaintiff's bargaining power)

19.     In addition to malicious prosecution, Plaintiff was suing David D. Stebbins for breach of contract. He asked the David D. Stebbins, on two separate occassions during discovery, to admit that Plaintiff had no bargaining power to negotiate the terms of the contract, and had no choice but to accept David D. Stebbins' terms. This was done to prove that the contract was unconscionable, and thus, should have been voidable in Plaintiff's favor.

20.     On both occasions, Goldie (acting on behalf of David D. Stebbins) stated that Plaintiff had bargaining power. On the second time, Plaintiff asked the Defendant to justify his answer by stating what "meaningful alternatives" Plaintiff had (by using the exact phrase "meaningful alternative," Plaintiff was in the hopes that he could put the two on notice that he was asking them to refute a presumption of unconscionability). Goldie – acting on behalf of David D. Stebbins – simply said "Plaintiff did not have to accept any contract or could have sought another contract."

21.     However, both of these statements were contradicted by David D. Stebbins' own testimony at the jury trial, where he freely admitted that Plaintiff was faced with a choice between accepting David D. Stebbins' extremely one-sided terms, or being literally homeless.

22.     This means that, by David D. Stebbins' own admission, his two previous discovery responses were lies.

### Sub-Section 5: Perjury Nos. 3, 4, & 5

23.     Plaintiff is aware that, in 2006, David D. Stebbins had his driver's license revoked pursuant to a DUI charge. To get his driver's license back, the Defendant was ordered to attend an Alcoholics Anonymosu (or AA for short) session.

24.     Plaintiff is also aware that the Defendant never attended this session, instead opting to drive his own vehicle, anyway, even without a driver's license. Plaintiff knows this because David D. Stebbins often gloats about how he "doesn't need" the AA session, since he "already learned his lesson."

25.     Plaintiff attempted to draw attention to that, during the jury trial, since it was relevant, under Arkansas Rule of Evidence #406 to show that David D. Stebbins considered himself above the law.

26.     However, when the jury trial got underway, David D. Stebbins made the following statements, under penalty of perjury:

    (a)     He does not drive (specifically because he has no license), and

    (b)     He attended the AA session, but

    (c)     He still does not have a driver's license because it costs too much to renew.

27.     All three of these statements were bald-faced lies, done to cover the fact he considers himself above the law. He does indeed drive himself on a regular basis; he never attended the court-mandated AA session BECAUSE he did not believe he deserved to have to go, and the reason he never renewed his driver's license is not because he cannot afford to do so (it would only cost twenty bucks), but because he knew they would not give it to him without a certificate

of completion from said AA session, which he had no intention of attending.

### Sub-Section 6: Perjury Nos. 6 & 7 (David D. Stebbins' perjury about his drinking habits & the speed at which alcohol leaves the human body)

28.     During the jury trial, Plaintiff attempted to use David D. Stebbins' drinking habits to show that the Defendant was intoxicated at the time of the altercation that resulted in Plaintiff's arrest.

29.     The Defendant affirmatively denied that he was intoxicated. However, to support this denial, he said the following two things:

(a)     He only drinks about four 12oz cans of beer per day, and

(b)     Beer exists the human body at a rate of 2 "beers[5]" per hour, that this is a flat rate, independent of gender, body size, or anything else that is specific to the individual. To support this pseudo-science, he said that he learned this at his AA session.

30.     The second one is already a lie. First of all, as stated before, he never attended the AA session. However, even if we were to believe him on that count, it is still completely ludicrous to think that alcohol exits all human bodies at the same rate.

31.     However, the statement made in ¶ 16(a) also contradicts a statement the Defendant made only a few minutes later: When asked exactly how much alcohol he *purchases* (since it would go without saying that he *consumes* that much alcohol, because what's the point of purchasing alcohol if you're not going to drink it), he said it was "two cases per week." When asked how many beer cans were in a case, he replied "thirty." This meant that he purchases (and, by proxy, consumes) sixty (60) cans of beer per week. This comes out to a little bit more than eight (8) cans per day (because 56 cans per week would be exactly 8 cans per day).

32.     This is an enormous inconsistency, since no matter how long it takes for alcohol to leave

---

5   Plaintiff assumes that, by "beer," David D. Stebbins was referring to a standard 12oz can of beer.

*his* body, he would stay intoxicated for twice as long, after drinking eight cans of beer, than if he

only drank four, significantly decreasing the likelihood that he would have sobered up by the

time the altercation happened that resulted in Plaintiff's arrest.

### Sub-Section 7: The Judicial Remarks showing ADA Retaliation

33. On May 22, 2015, after the jury had entered its verdict, Plaintiff filed, in his state court

action, a "Motion for Judgment NOV or in the Alternative for New Trial." As this Court may

have guessed, that motion was denied. Specifically, it was denied on June 8, 2015. However,

when issuing his advisory opinion, Special Judge Russel Rogers made the following comments

about Plaintiff: "Mr. Stebbins uses his medical condition, if such truly exists, as a weapon ... I

believe him to be not just a nuisance but, far more importantly, a danger to himself and to

others."

34. The "medical condition" Rogers was referring to was Plaintiff's Asperger Syndrome,

which is what sparked Plaintiff's large *number* of otherwise legitimate and good-faith lawsuits

(see ¶ 3 of this Complaint, and all the previous pleadings that it incorporates). However, although

he made clear his reasons for why he felt Plaintiff was a "nuisance," his accusation that Plaintiff

was "a danger to himself and to others" came entirely out of nowhere, without any factual basis,

whatsoever (with or without evidence).

35. On June 11, 2015, Plaintiff filed a "Second Motion for New Trial and to Recuse,"

pointing out to Rogers that Plaintiff has the *absolute right* to an impartial judiciary (see Tumey v.

Ohio, 273 US 510, 535 (1927), upholding this right "[n]o matter what the evidence was against

him"). Of course, this Motion is just going to be denied. The only thing that remains to be seen

is ... what contrived excuse will the special judge give for denying the motion? Or, will he give

any at all? Maybe his order will simply be a single sentence: "The Plaintiff's Second Motion for

New Trial and to Recuse is denied."

36.     Plaintiff will also be filing an appeal in that case.  However, the Appellate Court is just

going to affirm the decision.  Why?  Because Plaintiff is a poopyhead who doesn't deserve

justice.  They will find some excuse – no matter how contrived – to justify affirming the

decision.  Maybe they will say that Plaintiff has not shown how any of the judge's errors had any

impact on his case (which, if they say that, it would be a complete lie, because Plaintiff does

indeed plan on including that argument in each section of his Briefing).  Maybe they won't even

ATTEMPT to justify why they affirm the decision; they will probably just issue a single sentence

saying "We find no grounds for reversible error and affirm," and nothing else beyond that.

Simply because they can.

37.     In any case, as the upcoming legal argument will show, the recent developments in the

current case authorize this Court to issue relief to the Plaintiff, so Plaintiff does not have to resort

to the state appellate courts.

### Sub-Section 8: Goldie's and David D. Stebbins' ex parte communication with the special judge. & the destruction of evidence

38.     On June 15, 2015, James E. Goldie – acting as defense counsel for David D. Stebbins[6] –

filed his answer to Plaintiff's "Second Motion for New Trial and to Recuse."  In this answer,

Goldie made the following statement:

> "The Court was well aware that after the jury verdict the Plaintiff within twenty-
> four (24) hours drank a substantial amount of bleach as a suicide attempt-"

39.     Plaintiff spoke of this suicide attempt in ¶¶ 27-28 of his original complaint in this case.

40.     There are any number of ways that Russell Rogers could have learned of this event.  The

same goes for Goldie.  That is not the problem here.

---

6   Because of this, David D. Stebbins is automatically vicariously liable for any/all acts of his counsel. See *Inman v. American Home Furniture Placement, Inc.*, 120 F. 3d 117, 118-119 (8th Cir. 1997). See also *Siems v. City of Minneapolis*, 560 F. 3d 824, 827 (8th Cir. 2009).

41.     The problem is that Goldie somehow knew that Rogers knew about this event.

42.     This event did not make the newspaper. As a result, the Defendants cannot argue that they knew about it for the same reason they knew about Darren Wilson shooting Micheal Brown in Ferguson, MO. Even if it did make the newspaper, the Harrison Daily Times only circulates inside Boone County, and Russell Rogers is based out of Suttgart, AR, which is located in Arkansas County. Rogers would not have read about this event in the newspaper, even if the newspaper did cover it.

43.     There is no indication, on the record, where Rogers advised the parties that he was aware of this event. Nor is there any indication, on the record, that Goldie ever advised Special Judge Rogers of this event.

44.     So, if there was nothing *on the record* telling Goldie that Rogers knew about the event, then the only way Goldie could have known that Rogers had this knowledge was ... by having a conversation together *off the record*.

45.     It is important to note that this is not the first time that Goldie has engaged in ex parte communications with presiding judges. On September 21, 2013, he and then-presiding judge Gordon Webb had an ex parte communication, although the only thing Plaintiff knows they talked about was to push back the oral argument scheduled that day to later that afternoon (which is why Plaintiff did not complain about it at that time). Then, on April 16, 2015, Goldie sent an email to Russel Rogers' secretary, saying that he was not going to submit any new proposed jury instructions, but did not serve a copy of that email on Plaintiff (Plaintiff only got a copy of it because Rogers' secretary sent it to him). So, obviously, Goldie is not afraid to engage in ex parte communications, as long as the opposing party "deserves" it.

46.     "So what," the federal court is probably thinking to itself right now, "If they had ex parte

communications, that may be unethical, but unless there is evidence that they met with the purpose of rigging the case in the defendant's favor, then the federal courts have no authority to interfere in state court proceedings."

47.     Indeed, that is the law. However, there is evidence that they met with the purpose of rigging the state court action.

48.     Specifically, the fact that they have no other purpose to meet. THAT is what proves that they met for the purpose of rigging the case.

49.     See, it's a matter of "behavioral science" that a human action needs a motive. People do not do things for no reason; even if the reason is entirely evil, even if the reason is entirely superficial, even if the reason is entirely *illogical*, or even if the reason is not apparent to anyone except the actor, there always is a reason for every little thing a person does.

50.     For example:

(a)     Reading books and watching movies. Those activities are done for *entertainment*. "Fun" is a perfectly viable human motive. However, it's a motive nonetheless. Humans are not going to stare at a book without actually reading it; because there is no point to it.

(b)     If we stand, with out feet parallel, bend over and touch our toes, then stand back up, touch our toes again, over and over again, there is a purpose to that activity: *Exercise*. However, there IS a point to it.

51.     Sometimes, we do not accomplish the purpose we set out to do. For example, if a person in a ski mask points a gun at a cashier and demands money, but a security guard he didn't see before runs up behind him and tackles him like a football player, subduing him until the police arrive and arrest him, then the robber has failed to accomplish his goal. However, the goal was still *there*. Failure does not negate the existence of the goal in the first place.

52.     Thus, if we can accept, as common knowledge, that every human action has a motive behind it, then that begs the question: What motive could possibly be behind Goldie and Rogers meeting up? The two live in two separate cities that are more than 180 miles apart from each other, so the odds that the two were meeting up for a "social call" is astronomical.

53.     No, instead, the most likely reason they were meeting up was … case-related.

54.     If we accept that the meeting was, in all likelihood, case-related, then it is almost certain that they were meeting for the purpose of discussing what the rulings on the various motions should be.

55.     And that means that they collaborated to rig the case in their favor.

56.     On June 18, 2015, Plaintiff sent an email to Rogers and Goldie, explaining to them what he just explained in this Amended Complaint, and demanding an explanation when Rogers issued his order on Plaintiff's Second Motion for New Trial and to Recuse.

57.     On June 20, 2015, Plaintiff received a letter from Goldie, addressing these accusations. In this letter, Goldie actually – believe it or not – ADMITTED to having *ex parte* communications with Special Judge Rogers' secretary – Kristie Williams – although he denied having *ex parte* communications with Russel Rogers directly (as if going through Rogers' secretary somehow made the *ex parte* communications legit).

58.     Of course, Goldie never said what the two were talking about, and so, on June 21, 2015, Plaintiff sent an email to Russel Rogers and Jim Goldie, where he reiterated how astronomical it was that he and Kristie Williams were just "chatting" as friends, because again, the two lived about 180 miles apart from each other. Instead, it was much, much more likely that they were talking for case-related reasons. If that is what they were talking about, then it STILL amounted to "ex parte communications." The fact that Goldie was using Rogers' secretary as liaison means

absolutely nothing.

59.    Plaintiff demanded that Rogers address that elephant-in-the-room in his upcoming advisory opinion, in addition to the aforementioned accusations of *ex parte* communications.

60.    On Jun 26, 2015, Russel Rogers issued an advisory letter, showing several *ex parte* communications besides these. Almost all of these emails between Goldie and Rogers were directly addressing the merits of the case, and yet, Plaintiff had previously received copies of NONE of these. Just a handful of quotes from these emails which show them directly addressing the merits of the state court case:

(a)    "I just got the letter yesterday. I then contacted the Clerk as to the jury costs. The clerk was not available both yesterday and today. I cannot do the impossible." Offered as an excuse as to why he did not fulfill his obligations in a timely manner. Thus, it is merits-related.

(b)    "Unfortunately, the Plaintiff does not realize that the judge is not an 'officer' under the terms of the Webb Order and the statute that allows attorney fees in contract cas4s1 cannot be waived in advance by Judge Webb." Clearly providing a counter-argument to the merits of Plaintiff's "Response To Motion And Brief On Juror Compensation And Court Reporter Charge," filed on May 28, 2015 at 1:03PM.

(c)    "Of course that means police officers and not the Judge. Also, Judge Webb cannot in advance waive any attorney fees that the statute on contracts allows." Again, arguing against the merits of Plaintiff's on-record response.

61. So before, Plaintiff was merely speculating that Goldie's discussions with Williams (and, by proxy, with Judge Rogers) were case-related; now we KNOW they were case-related, and thus, patently illegal.

62.     One July 6, 2015, Plaintiff received a copy (not yet filemarked, but soon to be so) of an order recusing himself from the proceedings. This means that he *admits* that either Plaintiff's accusations of bias and prejudice, and/or the issue of *ex parte* contacts, has merit.

63.     However, he chose not to rule on Plaintiff's Second Motion for New Trial. Instead, he chose to defer the motion to the succeeding judge.

64.     Only problem is ... the Motion had to get a ruling by July 10, 2015, otherwise, it is denied by default. See Ark.R.Civ.P. 59(b) "If the court neither grants nor denies the motion within 30 days of the date on which it is filed or treated as filed, it shall be deemed denied as of the 30th day." So, even when he is admitting that Plaintiff got a raw deal, he is still using his self-admitted hatred of Plaintiff to screw him over. He has found a loophole so that the prejudicial judgment still remains on the record, while he technically gets to wash his hands of the matter.

65.     Under most circumstances, this would be considered clever. However, since his search for the loophole was *fueled* by his hatred towards Plaintiff, and said hatred was, by proxy, fueled by at least one of Plaintiff's statutorily protected activities, that means that the *search* for the loophole was an unlawful act of retaliation, even if the loophole itself was not illegal in and of itself.

### Sub-Section 9: Destruction of Evidence

66.     In his June 26 email, Rogers did not produce the emails that were actually spoken of in the June 19, 2015-dated letter from Goldie (you know ... where he tried to explain how he knew what Rogers knew without admitting to ex parte communications). Rogers said that this email was "unavailable."

67.     In other words ... it was deleted.

68.     It could not possibly have simply been overritten automatically to make space. Williams

has a Gmail email account. Even the free account from gmail allows storage space up to 50GB. If you know anything about computers, you know that this means she would have to send and/or received at least 2,000 emails (and that's *assuming* that each email contained the maximum-allotted 25MB attachments) before the account would have to automatically delete emails to make room. The odds that she could blow through such a high quota in only a few months is astronomical; to achieve that, her entire 40-hour-a-week job would have to be nothing but sending outing and reading incoming email, without any time spent doing actual *secretary* work.

69.     No, she *deleted* it in the hopes that Plaintiff wouldn't be able to use it as evidence. Fortunately, Plaintiff already has plenty of evidence of ex parte communications (as demonstrated in ¶¶ 60 & 61 of this Complaint), and besides, Goldie has already issued a written confession to this email.

70.     However, she still deleted it. She deserves to be punished as a matter of principle.

### Sub-Section 10:   Rogers' Attempt to Have Plaintiff Committed, and additional acts of discrimination on basis of perceived disability.

71.     On July 7, 2015, Plaintiff received, by regular mail, a letter from Russel Rogers. In this letter, he gave even more hate-filled remarks about Plaintiff, including the following paragraph:

> "The Plaintiff is suffering from a condition that I believe (from over 40 years of dealing with disturbed people) is more serious than Aspergers alone. He is most likely homicidal, is definitely suicidal, as well as paranoid and delusional. I am therefore sending a copy of this to the prosecuting attorney and to the Department of Human Services. I have been tempted to declare Mr. Stebbins incompetent on my own notion but believe that it is best to refer it to the proper authorities in Boone County."

72.     So, what we have here is Russel Rogers, by his own admission, issuing adverse rulings and denying Plaintiff justice, by reason of his belief that Plaintiff has a disability, and he isn't even PRETENDING like it's more than that.

73.    He also has stated that he is forwarding a copy of these accusations to the prosecuting attorney for the Fourteenth Judicial Circuit of the State of Arkansas, as well as the Arkansas Department of Human Services.  His goal, undoubtedly, was to have Plaintiff "declared incompetent" and to have him committed in the State Hospital.  It is this action – the forwarding of these accusations to the prosecutor with hopes of having Plaintiff committed – that form the basis of Plaintiff's common law malicious prosecution charge.

74.    Plaintiff will, in all likelihood, suffer an increase in government surveillance as a result of this accusation. They can't do anything yet, but they have announced their intention to commit Plaintiff, the next chance they get.  Even if they do not, that was clearly Rogers' intention, anyway, so he deserves to be liable all the same.

who confirmed that, although there was no basis for any charges at the time, he was going to keep an eye on Plaintiff, in light of these accusations. When Plaintiff asked "Does this mean that, if I can prove that his accusations were false, then his libel would have caused me the injury of 'increased government surveillance?'"  Elridge could not rebut that logic, though he tried to.

## SECTION II:  LAW AND DISCUSSION

75.    The following law governs the underlying causes of action:

### Sub-Section 1: ADA Retaliation  by Rogers, Hannah, Gay, and the State of Arkansas

76.    To support a claim of ADA Retaliation, Plaintiff must prove three essential elements: (1) That Plaintiff engaged in statutorily protected activity, (2) that Plaintiff suffered an adverse action from the Defendant(s), and (3) the adverse action was motivated, at least in part, by the statutorily protected activities.  See *Amir v. St. Louis University*, 184 F.3d 1017 (1999).

77.    Plaintiff has sufficiently plead the first element in Section I, Sub-Section 1 this Complaint.

78.     Plaintiff has sufficiently plead the element of "adverse action" in Section I, Sub-Section 3 of this Complaint. Specifically, the adverse action was "loss of court access" for most claims, and "deprivation of absolute right to impartial judiciary" for the rest.

79.     Did Plaintiff forget to mention that JUDICIAL IMPARTIALITY IS AN ABSOLUTE RIGHT!!!

80.     Therefore, Plaintiff absolutely has alleged the essential element of "adverse action."

81.     The element of "causal connection," insofar as it concerns Russel Rogers and the State of Arkansas, has been admitted to, as set forth in Section I, Sub-Section 7 of this Complaint. There is nothing to prove, here.

82.     The element of "causal connection," insofar as it concerns Jim Goldie and David D. Stebbins, is sufficient plead in Section I, Sub-Section 2 of this Complaint. Although the Defendants swear that the adverse action was caused by Plaintiff's own knife attack, bear in mind that, for purposes of a Complaint, Plaintiff's allegations must be assumed as true.

83.     This leaves us with only one question: Does the Plaintiff actually use his Asperger Syndrome as a "weapon," as Russel Rogers suggests?

84.     Plaintiff denies that. In fact, he maintains that every single lawsuit he has ever filed – ADA or otherwise – has been in good faith. However, even if Rogers could somehow show evidence that Plaintiff was milking his status as a disabled person, guess what? No, seriously, guess!

85.     Go ahead. Guess.

86.     It STILL DOESN'T MATTER, because the 8th Circuit has already ruled that this is not a defense to retaliation!

87.     The case law in question is *Shaver v. Independent Stave Co.*, 350 F. 3d 716 (8th Cir.

2003), which has held, in pertinent part, the following:

> "When contacted by Mr. Shaver's acquaintances, Mr. Bacon told them that he could not recommend Mr. Shaver because he had 'a get rich quick scheme involving suing companies.' ... On the basis of these facts, the district court concluded that Mr. Shaver was attempting to manufacture a retaliation claim against Salem by baiting Mr. Bacon into giving negative references because of Mr. Shaver's suit.
>
> We are unable to agree with the district court's view that claims that are 'manufactured' in the sense that the court used the word are not actionable. ... The district court seems to have added an additional requirement, namely, that the party asserting the claim did not purposefully seek the adverse action. Nothing in the words of the statute or in our cases, however, suggests that the conduct of the aggrieved party, other than the party's initial protected activity, is relevant. Rather, the law focuses exclusively on the conduct of the alleged retaliator in determining whether the aggrieved plaintiff has a claim.
>
> Our view of the matter finds support in the so-called "tester" cases, where minority applicants apply for jobs or housing that they have no intention of accepting for the sole purpose of determining whether the employer or landlord is unlawfully discriminating. In those cases, defendants have objected that there was no real substance to the plaintiffs' claims since those claims were created solely for the purpose of litigation. The courts, however, have advanced two different reasons for allowing such suits to proceed.
>
> First, the mere fact of discrimination offends the dignitary interest that the statutes are designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs. ... By giving litigants an incentive to attack illegal activity by employers, Congress enlisted private self-interest in the enforcement of public policy." See *id* at 724-725.

88.     Thus, Rogers has alleged facts that he believes justify his retaliation (despite offering absolutely no evidence to support this accusation), but it turns out that THIS DOES NOT ACTUALLY JUSTIFY IT!

89.     Thus, Rogers (and, by proxy, the State of Arkansas) has given Plaintiff, on a silver platter, a *prima facie* case for retaliation, and has attempted to allege a completely non-existent affirmative defense to his conduct. What more do you need?

90.     Plaintiff's litigation history may or may not have been primary factor in Rogers' rulings,

and it may or may not have been a factor in every one of his rulings.  That is not relevant.  What matters is that, by Rogers' own admission …

- … at least one of Plaintiff's statutorily protected activities …

- … played, for even one single solitary second …

- … at least a 0.00000000000000000001% role …

- … directly or indirectly, consciously or sub-consciously …

- … in anything Rogers did …

- … that was adverse to the Plaintiff.

91.     Therefore, the retaliation was unlawful.  It is not necessary that the statutorily protected activity be the "sole" motivating factor; as long as it plays even the most miniscule of roles in anything a retaliator does, it's recoverable.

92.     Nor is it required that the adverse action be intentional (even though, in this case, it was).

93.     The only question that remains is the *extent* of damages, not whether Rogers committed retaliation in the first instance; therefore, litigation is required and pre-discovery dismissal is not warranted.

94.     Rogers was appointed by Donna Gay and Jim Hannah, acting on behalf of the Administrative Office of the Courts, an arm of the State of Arkansas.  As a result of this, those four Defendants are jointly liable, because they appointed the rogue judge.

**Sub-Section 2: ADA Discrimination**

95.     In addition to his accusation that Plaintiff "uses his medical condition, if such truly exists, as a weapon," he has also stated that he believes Plaintiff to suffer from something "far more serious than Aspergers alone."  This satisfies the first essential element of ADA Discrimination: A person is deemed "disabled" within the definition of the Americans with Disabilities Act if the

alleged discriminator BELIEVES him to have a physical or mental impairment that substantially

hinders one or more major life activities, regardless of whether the Plaintiff indeed has such an

impairment. See 42 USC § 12102(1)(C) & 42 USC § 12102(3).

96.    The element of "adverse action" can be judicially noticed.

97.    Rogers has ADMITTED that his belief that Plaintiff has this impairment (although he, not

surprisingly, has not been able to tell us what this alleged mental condition is *called*) has formed

the basis of his adverse rulings. Therefore, the essential element of "causal connection" is

pending. He issued this confession, most likely in the belief that he would enjoy judicial

immunity. But the joke is on him, because as we are soon to cover, immunity has been taken

away from an Act of Congress, even against the Courts!

### Sub-Section 3: Lack of Immunity for ADA Discrimination & Retaliation

98.    It is important to understand that there is no immunity for ADA Retaliation. See 42 USC

§ 12202. This abrogation of immunity has been upheld by the U.S. Supreme Court as not being

unconstitutional, even when they involve Courts. See *Tennessee v. Lane*, 541 US 509 (2004).

99.    Since there is no immunity for courts, it is safe to assume that there is no immunity for

Court *officers*, either.

100.    Therefore, neither the State of Arkansas, nor Russel Rogers, enjoy any immunity,

whatsoever, for their retaliation or their discrimination.

### Sub-Section 4: The Substantial Difference With Previous Case

101.    The factual allegations contained in Section I, Sub-Section 3 of this Complaint bear

substantial similarities with Case No. 15-0332 of this Court. Let the Court be well aware that

this is NOT the same case!

102.    The Court dismissed that case on the grounds that unintentional acts cannot form the

basis of a § 1983 claim. Well, this time around, it is not a § 1983 claim; it is an ADA Retaliation claim; the grounds upon which the previous case was dismissed are moot, here. For an ADA Retaliation claim, a lack of discriminatory intent would, at best, be a bar to monetary damages, not a bar to liability in the first instance. See *Meagley v. City of Little Rock*, 639 F. 3d 384 (8th Cir. 2011).

103.    Plaintiff has a Motion for Reconsideration pending in that case. If that Motion is granted, Plaintiff would have no objections to merging that case with this one. But for purposes of getting *this* case in the door, Plaintiff has alleged sufficient facts.

### Sub-Section 5: Rogers' Personal-Capacity Malicious Prosecution & Defamation

104.    Rogers claimed that he was submitting a copy of these accusations to the prosecutor and Department of Human Services in hopes of having Plaintiff committed to an asylum. This is not an act "normally performed by a judge;" to the contrary, anybody can do that, as it is part of the First Amendment right to petition the government for a redress of grievances. Thus, it does not fall within the definition of a "judicial act," as defined by the precedent of *Stump v. Sparkman*, 435 US 349, 362 (1978). As a result, Russel Rogers has no judicial immunity in the first instance. It is not merely taken away, or waived; he never had it to begin with.

105.    To state a claim for malicious prosecution, Plaintiff must allege (and then, as the case progresses, subsequently prove) the following essential elements: (1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant, and (5) damages. See *Bank of Eureka Springs v. Evans*, 109 SW 3d 672, 690 (2003).

106.    Russel Rogers has contacted the prosecutor in the hopes of having Plaintiff committed. This satisfies the first essential element.

107.    The essential element of "absence of probable cause" is satisfied in two ways, either one of which are singlehandedly sufficient to satisfy this element:

(a)    First, the underlying *facts* are total nonsense. He has no evidence to support his accusation that Plaintiff is mentally incompetent, and certainly no evidence to support his ridiculous accusations that Plaintiff is "homicidal," "paranoid," or "delusional." Besides, Plaintiff has already been through a mental diagnosis, once already, in connection with a previous criminal charge, and in it, Plaintiff was, indeed, diagnosed as mentally competent. So, the charges are patently false, as a matter of fact. What's even worse is the fact that Russel Rogers was actually *made privy* to this diagnosis (because remember from the bullet points between ¶¶ 12 & 13:  Plaintiff introduced a copy of that diagnosis as an exhibit at trial), and so Rogers loses probable cause pursuant to the precedent of *Kuehl v. Burtis*, 173 F. 3d 646, 650 (8th Cir. 1999)[7].

(b)    Second, even if the factual allegations are true (which they are not), there is still no grounds to subject Plaintiff to incarceration – prison or asylum alike – until he actually *does* something illegal. See *Robinson v. California*, 370 US 660 (1962) (holding a California law as unconstitutional when it bans the crime of *being* a narcotics addict, without regard to actual narcotics *use*, stating that "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold" *id* at 667). Thus, probable cause is absent because no reasonable person would believe that a person has *done* something illegal, simply by nature of *having* a mental health issue.

108.    It appears very unlikely that Plaintiff will be charged with anything, for the reasons set

---

7    "because the totality of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer … is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists"

forth in ¶ 107(b). Therefore, the second essential element has been sufficiently plead.

109.    Russel Rogers has made his malice apparent from Day One. Therefore, the fourth essential element has been satisfied.

110.    Plaintiff will, in all likelihood, suffer an increase in government surveillance as a result of this accusation. They can't do anything *yet*, but they have announced their intention to commit Plaintiff, the next chance they get. Even if they do not, that was clearly Rogers' intention, anyway. Therefore, the fifth and final element of malicious prosecution – damages – has been sufficiently plead.

111.    Plaintiff is also suing Russel Rogers for a personal-capacity defamation claim. To prevail on a claim of defamation, Plaintiff must allege and subsequently prove the the following essential elements: "First, that he has sustained damages. Second, that [the Defendant] published a false statement of fact concerning [the Plaintiff]. Third, that the statement of fact was defamatory. Fourth, that [the Defendat] acted with negligence in failing to determine the truth of the statement prior to its publication or with knowledge that the statement was false. And fifth, that the publication of the statement was a proximate cause of [the Plaintiff]'s damages." See *Wal-Mart Stores, Inc. v. Lee*, 74 SW 3d 634 (2002).

112.    For the first and fifth elements, Plaintiff incorporates, by reference, the contents of ¶ 110 of this Complaint.

113.    The second and third elements – the publication of a false statement, and its defamatory nature – are both self-explanatory.

114.    The fourth element – negligence in determining the truth of the matter – is evidenced by the aforementioned introduction of a mental diagnosis as an exhibit at trial. Rogers was *made privy to evidence* that refuted his beliefs, and came from a man with actual medical *credentials*.

If he didn't take advantage of the opportunity handed to him and reviewed that evidence, he has no one to blame but himself for failing to do so.

115.    As a result, Plaintiff has sufficiently plead the essential elements of defamation, and is entitled to recover on them.

### Sub-Section 6: ADA Retaliation against Goldie and David D. Stebbins

116.    Goldie, acting on behalf of David D. Stebbins, filed a motion seeking to strip Plaintiff of his constitutional right to court access. This, unquestionably, constitutes an adverse action.

117.    Since Goldie (and, by proxy, David D. Stebbins) admitted to committing this adverse action based, at least 0.000000000000000000001%, on at least one statutorily protected activity from Plaintiff, the element of "causal connection" is sufficiently plead.

118.    Plaintiff did not suffer any injuries as a result of this adverse action until Jun 8, 2015. However, on that date, Special Judge Russel Rogers had demonstrated that Goldie's and David D. Stebbins' attempt to instill prejudice against Plaintiff was, at least partially, successful, when Rogers denied Plaintiff's for New Trial, and the denial was based, at least 0.000000000000001% in part, on Plaintiff's statutorily protected activities.

119.    Therefore, Plaintiff is entitled to recover for this retaliation.

### Sub-Section 7: The § 1983 claim for collaborating with the judge through secretary

120.    David D. Stebbins is automatically liable for any/all actions of his attorney. See *Siems v. City of Minneapolis*, 560 F. 3d 824, 827 (8th Cir. 2009) ("we have long held that litigants choose their counsel at their own peril"). See also *Link v. Wabash R. Co.*, 370 US 626 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent")

121.    Furthermore, private citizens can be held liable in federal court for violations of 42 USC

§ 1983. Even though that statute normally only prohibits state action, a suit under this statute against private citizens is allowed if those citizens worked alongside one or more state actors to violate Plaintiff's constitutional rights. See *White v. McKinley*, 519 F. 3d 806, 815-816 (8th Cir. 2008) ("Although § 1983 can only be used to remedy deprivation of rights done under the color of law, a private actor can be liable 'under § 1983 for conspiring with state officials to violate a private citizen's right[s]'").

122.    Here, Goldie (acting on behalf of David D. Stebbins, making that man vicariously liable) has conspired with a state actor (Special Judge Russel Rogers, appointed by Donna Gay and Jim Hannah, using Kristie Williams as liaison) to deprive Plaintiff of his Fourteenth Amendment right to due process of law (specifically, by depriving Plaintiff of his right to view and confront the evidence against him by not making Plaintiff privy to some of Goldie's communications with the Court).

123.    Kristie Williams is liable because she unlawfully served as liaison to facilitate this communication, despite having no plausible excuse for not realizing that this communication (and, by proxy, her involvement in it) was patently illegal. You do not hang around lawyers for more than two weeks without realizing that they have strict behavioral standards they must adhere to, and Williams was directly assisting her boss in breaching those ethical standards. Although Russel Rogers may have judicial immunity for this, his secretary does not.

124.    Meanwhile, David D. Stebbins is jointly liable because he was Goldie's client while this communication was going on. It is black letter law that litigants are liable for the acts and omissions of their freely-retained counsel. See *Siems v. City of Minneapolis*, 560 F. 3d 824, 827 (8th Cir. 2009)[8]. See also *Inman v. American Home Furniture Placement, Inc.*, 120 F. 3d 117, 118-

---

8   "We are not wholly unsympathetic to Siems's position. The record does not contain any evidence that Siems himself contributed in any way to the dilatory actions of his counsel. However, we have long held that litigants choose their counsel at their own peril."

119 (8th Cir. 1997)[9]. See also Comiskey v. JFTJ CORP., 989 F. 2d 1007, 1010 (8th Cir. 1993)[10].

See also *Pioneer Investment Servs. Co. v. Brunswick Assoc.*, 507 U.S. 380, 396 (1993)[11].  See

also *Link v. Wabash R. Co.*, 370 US 626, 633-634 (1962)[12].

### Sub-Section 8: The Perjuries

125.    There is an Arkansas statute allowing citizens to bring private suits for damages for

felonies, without having to sue for their tort equivalents.  This statute is codified in the Arkansas

code as Ark. Code Ann. § 16-118-107, and states the following:

> "**(a) (1)** Any person injured or damaged by reason of conduct of another person
> that would constitute a felony under Arkansas law may file a civil action to
> recover damages based on the conduct.
> **(2)** The burden of proof for showing conduct that constituted a felony shall be a
> preponderance of the evidence.
> **(3)** If the person who is injured or damaged prevails, he or she shall be entitled to
> recover costs and attorney's fees.
> **(b)** The action may be maintained by the person who was injured or damaged or,
> after the person's death, the executor, administrator, or representative of his or her
> estate.
> **(c)** The remedy provided in this section shall be in addition to any other remedies
> in law or equity.
> **(d)** This section does not apply to offenses under § 5-28-101 et seq. or the
> Medicaid Fraud Act, § 5-55-101 et seq."

126.    So, this perjury claim is indeed properly before the Court, by invoking the federal court's

supplemental jurisdiction, after Goldie and David D. Stebbins are already made Defendants by

---

9   Litigants choose counsel at their peril. While it may seem harsh to make defendants answer for their attorney's
     behavior, any other result would punish Inman for the inaction of her opponents' lawyer ... If they were truly
     diligent litigants who were misled and victimized by their attorney, they have recourse in a malpractice action.

10  "A party chooses counsel at his or her peril. Counsel's disregard of his or her professional responsibilities can
     lead to extinction of his or her client's claims. It is a well-established principle that a party is responsible for the
     actions and conduct of his or her counsel and that, under appropriate circumstances, dismissal or default may be
     entered against a party as a result of counsel's actions."

11  "The court also appeared to focus its analysis on whether respondents did all they reasonably could in policing
     the conduct of their attorney, rather than on whether their attorney, as respondents' agent, did all he reasonably
     could to comply with the courtordered bar date. In this, the court erred."

12  "There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's
     unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his
     representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely
     selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in
     which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts,
     notice of which can be charged upon the attorney.'"

reason of their illegal ex parte communication with Russel Rogers, though Kristie Williams (this is why Plaintiff is giving this legal argument last, even though the factual allegations to support these claims came first). The question, therefore, is weather Plaintiff has alleged sufficient facts to support claims for perjury.

127.     Remember that it is the State of Arkansas' perjury statute, not the federal statute, that governs in this case, because this is invoking the Court's *supplemental* jurisdiction. See *Murphy v. LCA-Vision, Inc.*, 776 F.Supp.2d 886, 900-901 (E.D. Ark. 2011) (holding that *federal* felonies are not cognizable under A.C.A § 16-118-107, even when the case is being filed in *federal* court). That being said, the Arkansas state statute of Ark Code Ann. § 5-53-102 says the following:

> "**(a)** A person commits perjury if in any official proceeding he or she makes a false material statement, knowing it to be false, under an oath required or authorized by law.
> **(b)** Lack of knowledge of the materiality of the statement is not a defense to a charge of perjury.
> **(c)** Perjury is a Class C felony."

128.     The statement does have to be "material." To that end, Ark. Code Ann. § 5-53-101(a)(1) states the following: "'False material statement' means any false statement, regardless of its admissibility under the rules of evidence, which affects or could affect the course or outcome of an official proceeding or the action or decision of a public servant in the performance of any governmental function." However, Plaintiff has already explained the relevance of these pieces of testimony, when he was laying out the facts in this Amended Complaint. Therefore, this element is sufficiently plead.

129.     For Perjuries Nos. 1, 2, and 6[13], the perjury is proven based on inconsistent statements. "When a person charged with perjury or false swearing has made inconsistent material

---

13 Lying about how much alcohol he consumes on a daily basis. Perjury No 7 is when he lied about how long it takes for alcohol to leave the human body.

statements under oath and affecting the same matter or transaction, all the several inconsistent

material statements may be charged in different counts of the same indictment or information.

Proof of the inconsistency of statements is of itself evidence that one (1) of the statements is

false, and it is not necessary to sustain a conviction to establish which statement is false." See

Ark. Code Ann. § 5-53-106(a)-(b). Therefore, Plaintiff has alleged sufficient facts, in those three

counts of perjury, to show that the Defendant was lying in at least one of them.

130.    For Perjuries Nos. 3, 4, 5, and 7[14], Plaintiff has plead sufficiently that David D. Stebbins

and James E. Goldie were lying. Furthermore, they *knew* they were lying, because these are not

the sort of things one can say and genuinely believe them to be true. He either remembers going

to the AA meeting (and thus, should have the certificate of completion to prove it; we can

uncover that in discovery), or he doesn't. He either knows that he does not drive, or he knows

that he does. He knows the reason he does not have his driver's license, and making up that it

costs more than twenty bucks is ludicrous.

131.    Thus, Plaintiff has alleged sufficient facts to support seven (7) counts of perjury.

### Sub-Section 9:  Tampering with Physical Evidence

132.    This is also a felony, brought before this Court using its supplemental jurisdiction, and by

invoking the Arkansas statute of Ark. Code Ann. § 16-118-107.

133.    The Arkansas statute of A.C.A. § 5-53-111 states the following:

> "A person commits the offense of tampering with physical evidence if he or she
> alters, destroys, suppresses, removes, or conceals any record, document, or thing
> with the purpose of impairing its verity, legibility, or availability in any official
> proceeding or investigation."

134.    Even if Williams did not expect the *ex parte* communications to be subject to

investigation by the Committee on Professional Conduct or Judicial Discipline & Disability

---

14 This is the one where he said that alcohol exits the human body a flat, universal rate of "2 beers an hour."

Commission, surely she would not have deleted the emails while an *appeal of that same case* was still pending!  It is a matter of common sense that you do not throw away case-related documents while any stage of that case is still pending, including the 90 day period  when the losing party can petition the U.S. Supreme Court to review the matter!

135.    As such, she has no excuse for thinking that deleting those emails would not result in prejudice.  Therefore, she deserves to be punished for this conduct.

## SECTION III:  CLARIFICATION: WHO IS SUED FOR WHAT?

136.    We now have eight (8) defendants in this action, and a total of thirteen (13) causes of action to sue over.  Not all Defendants are included n all causes of action, either.  This could potentially get a little confusing.

137.    To help ease the confusion, Plaintiff is attaching **Exhibit A**, a table, listing all the Defendants, and all the causes of action, with checks showing which Defendant is being sued for which cause of action.

138.    Just remember:  "ADA Retaliation #1" is where Goldie and David D. Stebbins filed the motion to seek to deny Plainitff prospective court access, while "ADA Retaliation #2" is Russel Rogers' decision to incorporate Plaintiff's statutorily protected activities into his official rulings.  The "§ 1983" claim is where Goldie (acting on behalf of David D. Stebbins) collaborated with said special judge, through his secretary to rig the case in his client's favor.  Meanwhile, the seven perjuries correspond to how they were listed in this Complaint, while the "tampering with physical evidence" should be self-explanatory.

## SECTION IV:  RELIEF REQUESTED

139.    Plaintiff requests the following damages and injunctive relief:

### Sub-Section 1:  $11,000,000 for loss of case

140.    It is safe to assume that, but for any of these nine violations, the outcome of Plaintiff's

case might very easily have been very, very different from how it actually turned out.

### Sub-Section 2: $1,000,000 in emotional distress damages

141.    After the jury unanimously rendered a verdict in David D. Stebbins' favor, Plaintiff,

feeling that there was no justice in the world, retired to his apartment, expecting to never leave

that place.  Why, you ask?  Because as soon as he got home, he took off his shirt and proceeded

to ingest and entire Powerade bottle full of bleach.  He did not WANT to live in a world where

judges could simply ignore the law if they felt like it.

142.    To make a long story short, Plaintiff's life was saved.  He was taken to a hospital in

Jonesboro and diagnosed with Clinical Depression.

143.    The Defendants' actions drove Plaintiff to a literal suicide attempt.  As a result, Plaintiff

believes that a million dollars is well within the bounds of reason.

### Sub-Section 3:  $24,000,000 in punitive damages for each intentional act.

144.    Plaintiff asks for punitive damages twice that of the compensatory damages.  No one has

any business practicing law if they believe that ex parte communications are okay.  No one has

any business practicing law if they believe that perjury during civil discovery is legal.  In fact,

any person who believes this would, in all likelihood, fail the bar exam.

145.    The Defendants' actions were patently illegal, and, based on the quotes given in ¶ 60 of

this Complaint, clearly done out of spite and animosity.  They are very much deserving of

punitive damages.

146.    Even in the astronomical event that Plaintiff prevail on appeal, or on his "Second Motion

for New Trial and to Recuse," Plaintiff still requests $24M in punitive damages.  The reason is

because, even if it turns out that the Defendants ultimately failed to inflict the injury of "loss of case" on Plaintiff, they still deserve to be punished for trying. "Punitive damages should bear a reasonable relationship to the harm *that is likely to occur from the defendant's conduct* as well as to the harm that actually has occurred." See *TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 460 (1993).

147.    Plaintiff also asks for $24,000,000 in punitive damages for each and every act on which Plaintiff prevails in this case. Each one is individually deserving of punitive damages, and so they should get individual punitive damages each.

148.    Plaintiff also asks that each *Defendant* who is found liable be held liable for a separate set of punitive damages. For example, if Plaintiff prevails on the issue of *ex parte* communications, then Plaintiff asks for $24,000,000 each from Goldie, David D. Stebbins, and Kristie Williams.

### Sub-Section 4: $3,000 per day for each day the prosecutor & DHS do not withdraw their heightened surveillance.

149.    As a result of Russel Rogers' defamation and malicious prosecution, Plaintiff has suffered the injury of "increased government surveillance." Unless and until Plaintiff receives proof that this increased surveillance is being terminated, Plaintiff demands to be compensated the sum of $1,000 for each day of increased surveillance.

150.    He also demands twice that much – or $2,000 per day – in punitive damages, because Rogers acted out of pure hatred for Plaintiff, and nothing more.

### Sub-Section 5: Injunction to cease and desist any/all retaliation & discrimination, no matter what.

151.    Plaintiff asks that the State of Arkansas be issued an injunction to cease and desist any/all adverse actions or omissions caused, even slightly, by Plaintiff's litigation history.

152.    An exception can be made for charging Plaintiff with the crime of malicious prosecution

(and yes, that is an actual CRIME under Arkansas law. See Ark. Code Ann. § 5-53-131), so long as those charges are, themselves, non-frivolous (e.g. if it is revealed that the State had no real evidence that Plaintiff's lawsuit lacked probable cause, and they just charged Plaintiff because they don't like him, then that would violate this injunction).

153.    However, although Plaintiff will not make the patently frivolous request to be exempt from criminal prosecutions, he DOES demand that the State be ordered to cease and desist its surveillance of Plaintiff, beyond that of normal citizens.

154.    More importantly, the State should be forced to actually ENFORCE this injunction against her own officers.  If any officer commits any act in violation of these injunctions, the State should be obligated to A) fire that employee, B) compensate Plaintiff for the injuries caused by that employee's conduct, and C) if the conduct amounted to criminal conduct – even so much as a Class C Misdemeanor – to charge that person.

### SECTION V: JURY DEMAND

155.    If a trial is needed to adjudicate any material facts, Plaintiff demands that the case be tried by a jury of his peers.

### SECTION VI: CONCLUSION

The Defendants – especially the State of Arkansas – have kept up this discrimination and retaliation for four years now.  They clearly feel like the rules apply to everyone but them, and they need to be taught that the rules – especially the Constitution – applies to them, more than anyone.  No one is above the law, but they certainly seem to think of themselves as such.  It's time they be put in their place.

Wherefore, premises considered, Plaintiff respectfully prays that all the relief requested in Section IV be granted, costs incurred be awarded, and any other relief to which he may be

entitled.

So requested on this, the 30th day of June, 2015.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

**EXHIBIT A: CHART SHOWING WHO IS BEING SUED FOR WHAT**
(See p. 33, ¶¶ 136-138, for details)

| | Jim Hannah | Donna Gay | State of Arkansas | Russel Rogers | Kristie Williams | Jim Goldie | David D. Stebbins |
|---|---|---|---|---|---|---|---|
| ADA Retaliation #1 | | | | | | ✔ | ✔ |
| ADA Retaliation #2 | ✔ | ✔ | ✔ | ✔ | | | |
| Title II ADA Discrimination | ✔ | ✔ | ✔ | ✔ | | | |
| Personal Capacity Malicious Prosecution | | | | ✔ | | | |
| Personal Capacity Defamation | | | | ✔ | | | |
| § 1983 | | | | | | ✔ | ✔ |
| Perjury No. 1 | | | | | | ✔ | ✔ |
| Perjury No. 2 | | | | | | ✔ | ✔ |
| Perjury No. 3 | | | | | | | ✔ |
| Perjury No. 4 | | | | | | | ✔ |
| Perjury No. 5 | | | | | | | ✔ |
| Perjury No. 6 | | | | | | | ✔ |
| Perjury No. 7 | | | | | | | ✔ |
| Tampering with Physical Evidence | | | | | ✔ | | |