**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

Page 1 of 64

SEP 0 8 2015

JAMES W. McCORMACK, CLERK

By: _____
DEP CLERK

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

DAVID A. STEBBINS                                        PLAINTIFF

VS                          CASE NO. 4:15CV~~0036~~ 436 JLH

JIMM HANNAH, DONNA GAY, STATE OF
ARKANSAS, ADMINISTRATIVE OFFICE OF
THE COURTS, RUSSELL ROGERS, DAVID D.
STEBBINS, JAMES GOLDIE, KRISTIE WILLIAMS,          DEFENDANTS
GORDON WEBB, BRAD KARREN,WES
BRADFORD, THE CITY OF HARRISON,
ROBERT TURLEY, JOSH APPLEGATE, &
ONE UNKNOWN-NAMED POLICE OFICER

### SINGLE COMPLAINT AND JURY DEMAND

Comes now, *pro se* Plaintiff David Stebbins, who, pursuant to the Court's Order, dated

August 5, 2015, hereby submits the following Single Complaint & Jury Demand.

### SECTION I: DEFENDANTS AND CAUSES OF ACTION

1.      Generally speaking, Plaintiff sues all Defendants for being part of a comprehensive,

statewide scheme to deprive Plaintiff of his right to court access because they think the lawsuits

he has filed are stupid.

2.      Specifically, Plaintiff sues the following Defendants for the following things:

(a)      Wes Bradford and the State of Arkansas are sued for one (1) count of retaliation, in

violation of Sec. 503 of the Americans with Disabilities Act, and for one (1) count of

disability discrimination in violation of Title II of the Americans with Disabilities Act.

(b)      Jim Hannah, Donna Gay, the State of Arkansas, the Administrative Office of the

Courts, and Russel Rogers are sued for one (1) act of unlawful retaliation in violation of Sec.

503 of the Americans with Disabilities Act, and one (1) act of unlawful discrimination in

violation of Title II of the Americans with Disabilities Act.

(c)     Jim Hanna, Donna Gay, the State of Arkansas, the Administrative Office of the Courts, and Brad Karren are sued for one (1) count of ADA Retaliation in violation of Sec. 503 of the Americans with Disabilities Act.

(d)     Russel Rogers is sued, in his individual capacity, for one (1) count of malicious prosecution and one (1) count of defamation, by invoking this Court's supplemental jurisdiction.

(e)     Brad Karren is sued for one (1) count of First Amendment Retaliation for an act taken in his *administrative* capacity, rather than his judicial capacity, and furthermore, taken in the complete absence of jurisdiction.

(f)     Gordon Webb is sued for one (1) First Amendment violation, for an act taken in his administrative capacity, and also for one (1) act of perjury, for an act taken in his personal capacity.

(g)     James E. Goldie, David D. Stebbins, and Kristie Williams are sued for one (1) violation of 42 USC § 1983.

(h)     James E. Goldie and David D. Stebbins are sued for two (2) counts of perjury (and yes, that is a valid cause of action in a civil case; please see  Section V, Sub-Section 11 of this Complaint).

(i)     David D. Stebbins is also sued for five (5) additional counts of perjury.

(j)     Gordon Webb is sued for one (1) count of perjury in his personal capacity, and for one (1) violation of 42 USC § 1983 for an act taken in his administrative capacity.

(k)     Wes Bradford is also sued for one (1) count of perjury.

(l)     Kristie Williams is sued for one (1) count of tampering with physical evidence.

(m)      The City of Harrison, Turley, Applegate, and one unknown-named police officer

(Plaintiff knows this man's last name is Waldon, but not his first name) are brought before

this Court for A) cooperating with Russel Rogers, who committed malicious prosecution and

defamation in his personal capacity in an attempt to have Plaintiff committed to the State

Hospital, and B) for violating Plaintiff's rights under 42 USC § 1983 in doing so.

3.      Plaintiff is hereby attaching **Exhibit A**, a two-page exhibit containing two charts,

showing which Defendant is sued for what.

## SECTION II: JURISDICTION & VENUE

4.      This Court has federal question jurisdiction to hear and decide the matters of ADA

Retaliation, ADA Discrimination, and 42 USC § 1983.

5.      This court has supplemental jurisdiction to hear the claims of perjury, tampering with

evidence, and common law malicious prosecution & defamation claims.

6.      This court has personal jurisdiction, and proper venue, in this court because at least one

Defendant (the State of Arkansas, Donna Gay, or Jim Hannah; take your pick) operates, lives,

and/or is headquartered in Little Rock.

7.      The City of Harrison, Arkansas and the three unknown-named police officers are brought

before this Court under supplemental jurisdiction. Plaintiff believes that their harassment against

Plaintiff is caused by the acts of malicious prosecution and defamation, thus giving this Court

competent jurisdiction. Even if this Court sides against Plaintiff on that claim, it would still have

supplemental jurisdiction to *finish* the § 1983 claims, since the case *started* in this Court.

## SECTION III: SOVEREIGN IMMUNITY

8.      The State of Arkansas, Russel Rogers, Brad Karren, Gordon Webb, and Wes Bradford

normally have absolute immunity, whether it be 11th Amendment immunity for the State of

Arkansas, prosecutorial immunity for Wes Bradford, or judicial immunity for Rogers, Karren, and Webb.

9.      However, in this case, they are either sued for acts taken in their administrative capacities, in the absence of all jurisdiction, or they are sued for violations of either Title II, or Section 503, of the Americans with Disabilities Act.

10.     There is no immunity – not even judicial immunity – for violations of the Americans with Disabilities Act.  See *Tennessee v. Lane*, 541 US 509 (2004).  That case, on its face, only addressed 11th Amendment immunity, but it necessarily included judicial (and, by proxy, prosecutorial[1]) immunity, because one of the injuries claimed by George Lane in that case was that he was held in contempt of court for "failure to appear" because he refused to humiliate himself by climbing the stairs because there was no elevator.  See *id* at 514.

11.     Holding someone in contempt of court is an act that would, under normal circumstances, absolutely be protected by judicial immunity.  It has ALL the criteria for immunity set forth in *Stump v. Sparkman*, 435 US 349 (1978).  It is an act normally performed by judges, and since George Lane was subpoenaed into court[2] in connection with a criminal charge, he was undoubtedly dealing with the judge in his judicial capacity and with competent jurisdiction.

12.     However, because disability played the faintest, most indirect[3] of roles in his contempt charge, the U.S. Supreme Court held that there was no immunity.

---

1   Because prosecutorial immunity is a branch of judicial immunity, created because prosecutors perform "quasi-judicial functions." Therefore, where judicial immunity is lacking, so too is prosecutorial immunity.

2   How else could he be held in contempt for failure to appear if he had no obligation to appear in the first place?

3   Remember: His being held in contempt was not for having a disability, or for defacing the courtroom with a wheelchair, or something stupid like that. Technically, it was for failure to appear, but it was caused, at least in part, by Lane's paraplegia. Indeed, his paraplegia wasn't even the main reason he didn't appear; he appeared for his first court appearance by climbing the stairs (presumably with his arms). It as only in the second appearance – when he refused to humiliate himself further and refused to climb the stairs because of the humiliation it caused – only then was he held in contempt. Thus, the State of Tennessee could easily have made the argument that Lane's contempt charge was technically self-inflicted, but the Supreme Court didn't see it that way. Disability played only the faintest of roles, but that was all it took.

13.    Now, as far as the § 1983 claims are concerned, the State of Arkansas is, indeed, immune

from suit in those claims.  However, as you can see from Section I of this Complaint, as well as

Exhibit A to this complaint, the State of Arkansas is not a Defendant in those claims, for that

exact reason.

14.    Last but not least, the City of Harrison and her officers are not immune from suit because,

as we will see in Section V, Sub-Section 14 of this Complaint, their municipal policies violate

clearly-established law that is more than three decades old.  Thus, there is no qualified immunity.

15.    Thus, none of the defendants listed in ¶ 7 of this Complaint are immune from suit for the

things they are actually being sued for.

<h3 style="text-align:center">SECTION IV: FACTS OF THE CASE</h3>

16.    The following facts are necessary to understand this lawsuit.

<h3 style="text-align:center">Sub-Section 1: Plaintiff's Litigation History</h3>

17.    Plaintiff – a resident of t he city of Harrison, Arkansas and of Boone County, Arkansas –

has Asperger Syndrome, a disability which severely hinders his ability to socialize with others,

make friends, get jobs, get a girlfriend, etc.

18.    Because this disability is not obvious (like blindness or paraplegia), many persons do not

realize that it even IS a disability, and thus, they believe that they have no obligation under the

Americans with Disabilities Act to provide reasonable accommodations for it. This leads to many

times when Plaintiff does not get the reasonable accommodations he is supposed to be legally

entitled to. Thus, Plaintiff was faced, many many times, with two options: Either suck it up and

let people do whatever they want to him and walk all over him, or file suit in federal court.

Plaintiff quickly decided that the former was 100% out of the question.

19.    Plaintiff could not afford to hire an attorney on an hourly basis, and because

discrimination is an extremely complication area of law (indeed, the Defendant's mindset is an

essential element), it is extremely rare for an attorney to take a case on contingency, especially

when the Defendants in those cases honestly believe that they were doing nothing wrong.

20.    Thus, Plaintiff had no choice but to represent himself pro se in these matters.

21.    A list of the ADA cases where Plaintiff represented himself, prior to November 24, 2011,

are ...

(a)    Stebbins v. Reliable Heat & Air, LLC, Case No. 10-3305 in the U.S. District Court for

the Western District of Missouri. This lawsuit is in good faith because Plaintiff was doing the

best he could at his job, but the employer – by his own admission – made absolutely no

attempt to accommodate Plaintiff's Asperger Syndrome. This resulted in a few

misunderstandings between Plaintiff and the employer's customers that could easily have

been avoided if the employer had provided reasonable accommodations.

(b)    Stebbins v. University of Arkansas, Case No. 10-5125 in the U.S. District Court for

the Western District of Arkansas. This lawsuit was filed in good faith because Plaintiff – who

was an emotional wreck at the time out of fear of possibly hurting someone – made some

statements which the University of Arkansas perceived as a threat. Plaintiff tried to explain

that, because of his Aspergers, sometimes things can come out wrong, but the UA did not

want to listen.

(c)    Stebbins v. Mid States Promotions, Case No. 10-3041 in the U.S. District Court for

the Western District of Arkansas. This lawsuit was filed in good faith because Owner Jason

Jones threw Plaintiff out of his wrestling school in retaliation for some allegedly

disrespectful remark Plaintiff's allegedly made about one of Jones' best wrestlers, and never

even attempted to provide the extremely reasonable accommodation of allowing Plaintiff to

apologize.

(d)    Stebbins v. Wal-Mart Stores Arkansas, LLC, Case No. 10-3086 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because, although Plaintiff was not applying for any position that required him to interact with customers (having learned his lesson with Reliable Heat & Air), Wal-Mart's computerized employment application test nevertheless asked Plaintiff questions regarding how to be courteous with customers that involved position that Plaintiff was not even applying for. This, in Plaintiff's opinion, had the disparate impact of discriminating against people with Asperger Syndrome.

(e)    Stebbins v. Full Sail University, Case No. 10-3072 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because Plaintiff's attempts to communicate with the school's enrollment staff fell through the cracks because of Plaintiff's Aspergers, and the school refused to provide any accommodation whatsoever for Plaintiff's lack of social skills.

(f)    Stebbins v. Legal Aid of Arkansas, Case No. 11-3057 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because they refused to represent Plaintiff in "any matter" because Plaintiff had apparently said something they did not like, and much like Jason Jones before them, they refused to take into consideration Plaintiff's Asperger Syndrome by providing the VERY reasonable accommodation of allowing Plaintiff to apologize for whatever it was that upset them.

(g)    Stebbins v. Harp & Associates, LLC, Case No. 11-3078 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because the Defendants evicted Plaintiff because of all the aforementioned lawsuits previously listed in this Exhibit.

Plaintiff sued Harp & Associates in that case for much the same reason he is suing the State of Arkansas in this one.

## Sub-Section 2: The Criminal Charges

22.     Before we continue, Plaintiff wishes to notify the Court that this lawsuit was, indeed, filed before and dismissed by a federal judge.  See Case No. 4:14-cv-227-KGB in this Court. However, if you look at the Order of Dismissal from Kim Baker, you will see that the dismissal was "without prejudice." Therefore, this next set of factual allegations is properly before the Court.

23.     On November 24, 2011, Plaintiff was arrested, allegedly on counts of domestic battery. Plaintiff believes that the arrest was made so that Wes Bradford could have leverage to coerce Plaintiff into ceasing and desisting his litigation practices.

24.     But even if the arrest itself was not done with this goal in mind, Wes Bradford clearly decided to prosecute the charges – predetermined or otherwise – with the intent of getting Plaintiff to stop filing lawsuits he considers to be stupid.

25.     Here is the evidence that Plaintiff has to prove this:

26.     All throughout the criminal proceedings, Bradford repeatedly badgered Plaintiff in ways that rightfully should have had him fined by the Court, and in ways that, in an employment setting (rather than a courtroom setting) would undoubtedly give Plaintiff a cause of action for "hostile work environment."

27.     Here are some examples of the most glaring instances of badgering that Bradford subjected Plaintiff to:

    (a)     At a hearing to reduce Plaintiff's bail bond, dated December 16, 2011, Plaintiff's counselor at the time, Lew Marczuk argued to the Court that Plaintiff had no criminal record

beyond minor traffic violations. Bradford agreed that Plaintiff had no prior felony, but argued

that the bail should stay at $75,000, because of Plaintiff's "prior history." Since he admitted

that Plaintiff had no criminal record, that cannot possibly be the "history" he was talking

about, so the only "history" that he possibly could have been talking about was... Plaintiff's

litigation history!

(b)      At a motions hearing dated February 24, 2012, Was Bradford told the state judge that

Plaintiff was a vexatious and abusive lawsuit-filer. There really was no rhyme or reason for

this statement. It was supposed to just be an ordinary motions hearing, and Wes Bradford just

threw it out there, completely at random, that Plaintiff had filed a ton of lawsuits in the past.

He flatly admitted that he was only mentioning this litigation history was "[j]ust to make the

Court aware" (Page 3, Line 18 of the official transcript for that hearing).

(c)      At another motions hearing dated July 27, 2012, Wes Bradford pointed out that

Plaintiff's own mother would be right to disown Plaintiff because of his crimes. So, what

were these crimes? That Plaintiff attacked her husband with a flimsy non-lethal knife? HA!

No, of course not! No, the crimes which, in Bradford's opinion, were so heinous that they

would cause a mother to disown her son was... "Mr. Stebbins' propensity to file lawsuits

against anybody he doesn't like." It was at this point that Bradford actually cringed, like a

wizard who had just heard the name "Voldemort," showing that, in Bradford's mind, this

crime was so heinous that it was painful for him to even SAY it! Meanwhile, a knife attack

does NOT warrant a mother disowning her son, or a person cringing just at the thought of it.

(d)      On a motions hearing dated November 30, 2012, Wes Bradford repeatedly cut off

Plaintiff and would not let him get a word in edge-wise. He argued that, because offering a

plea bargain is discretionary, he should be allowed to make whatever demands he wants in

those plea agreements, even if those demands would be unconstitutional otherwise.

28.     On September 14, 2012, Bradford played what was supposed to be his trump card. He submitted a plea offer to Plaintiff – a plea offer Plaintiff never even asked for – offering to reduce the charges to Domestic Battery in the 3rd Degree (which is what it should have been in the first place) if Plaintiff would agree to plead guilty and accept a year of probation.

29.     This seems harmless enough. However, this was no standard plea agreement. There were a total of seven (7) terms and conditions of probation listed in this plea offer. Most of them were fine; they were standard probation terms, such as … no alcohol on probation … no further contact with the victim … and so on.

30.     However, Conditions #4 and #5 are the conditions which incriminate the Defendants in this case. Those conditions were thus: "4) the defendant [Plaintiff in this case] must dismiss any/all pending Pro Se lawsuits, 5) the defendant must not file any Pro Se lawsuits while on probation."

31.     Again, Plaintiff never asked for this plea offer to be submitted to him. However, Bradford submitted it anyway, since the whole criminal proceeding was meaningless if he could not use it to coerce Plaintiff into ending his lawsuits.

32.     Plaintiff was represented, at the time, by the Public Defender's Office. Bradford advised Plaintiff's counsel that the reason he wanted these two conditions were because he believed that Plaintiff had a "mental health issue" that compelled Plaintiff to file frivolous lawsuits.  Plaintiff does not have such a mental health issue (assuming one even exists that is recognized by the medical community), but Bradford believed Plaintiff to have one, and threatened to have Plaintiff convicted and incarcerated unless Plaintiff agreed to curb his First Amendment rights the way he demands.

33.     In a motions hearing dated November 30, 2012, Bradford argued that, because he is not

*required* to offer any plea bargains, he should be allowed to make whatever demands he wants,

without it being illegal.  More on that when we discuss the law on this claim.

34.     He eventually withdrew his demand that Plaintiff dismiss his lawsuits, which may serve

to mitigate the damages, but that would only be a *mitigation* of damages, not a *negation*.  After

all, even assuming that arrest and charges were not predetermined, pursuant to a conspiracy, he

still suffered *prolonged* jeopardy of his liberty that would have been, at the very least, heavily

shortened had the lawsuits and/or perceived mental health issue never been a factor in the first

place.

### Sub-Section 4: Goldie & David D. Stebbins' ADA Retaliation

35.     When Plaintiff posted bail to be released from pre-trial incarceration, Plaintiff sued David

D. Stebbins, the alleged victim in the criminal case, for seven (7) causes of action, including

malicious prosecution and abuse of process, for framing Plaintiff for that felony.  He was

represented by James E. Goldie.

36.     Sometime in the fall of 2013, the two defendants filed a Motion to have Plaintiff's Court

Access rights restricted, on the grounds that Plaintiff had already filed a large number of law-

suits. Again, most of them were ADA-related, and therefore protected from retaliation under Sec.

503 of the Americans with Disabilities Act.

### Sub-Section 5: The Malicious Prosecution Lawsuit
### Russel Rogers' Adverse Actions

37.     Russel Rogers was appointed as a special judge in the state court action on October 7,

2014. He was appointed by co-Defendants Jim Hannah (in his official capacity as Director of the

Arkansas Administrative Office of the Courts). Since then, Donna Gay has freely admitted that

she (and, by proxy, the entire Administrative Office of the Courts) does absolutely nothing to ensure that the judges they assign are qualified, in any way.

38.     Since being assigned, Russel Rogers made his disdain for Plaintiff clear. He issued a variety of adverse rulings that, in most circumstances, would be protected by judicial immunity, including, but not limited to, the following:

(a)     He denied Plaintiff's "Motion to Always Read the Law in Future Motions." This motion was designed to ensure that whichever judge got assigned to Plaintiff's case would actually FOLLOW the law, and not use his judicial immunity to his advantage. Although Plaintiff suffered no prejudice, just on this alone, it set the stage for everything else to come.

(b)     He dismissed, with prejudice, five of Plaintiff's seven claims. There was no motion to dismiss pending, and he never even ATTEMPTED to give any grounds for why they were being dismissed. He was dismissing them because ... he did not think Plaintiff deserved his day in court. He wasn't even PRETENDING like it was more than that.

(c)     He denied Plaintiff his right to discovery, simply on the grounds that Plaintiff's discovery requests were "confusing" and "unlikely to lead to admissible evidence." He never explained his decisions, or attempted to talk to Plaintiff about the alleged confusions.

(d)     He denied Plaintiff's motions for summary judgment, claiming that the facts were still disputed, when the Defendant had admitted to said facts in response to a Request for Admissions.

(e)     He declined to rule on the admissibility of any evidence until jury trial. This caused potentially inadmissible evidence to still be heard by the jury. He did this, simply out of a desire to ensure that Plaintiff had as difficult a time as possible

(f)     Right before the jury trial (which, for the record, he forced Plaintiff into before

Plaintiff had enough time to prepare), when a witness had not appeared, even though he never moved to quash his subpoena, he declined to send out a search party for that person, simply on the grounds that he personally did not consider this witness's testimony to be necessary. In other words, he was usurping the position of "Plaintiff's counsel" and deciding litigation strategy on Plaintiff's behalf.

(g)      Speaking of trying to decide litigation strategy on Plaintiff's behalf, when the trial got underway, and when Plaintiff was giving his own direct examination, he allowed the Defense Counsel (named Jim Goldie) to constantly interrupt Plaintiff's testimony and try to develop Plaintiff's testimony for him. He consistently tried to suggest evidence that Plaintiff should testify about, rather than waiting for his turn to conduct cross-examination. Judge Rogers allowed this, despite Plaintiff's protests, and specifically BECAUSE it prejudice Plaintiff.

(h)      Also during trial, he repeatedly allowed the Defense Counsel to introduce clearly inadmissible evidence (such as hearsay evidence, evidence of prior acts that Plaintiff allegedly did, etc.) simply on the grounds that Plaintiff had already introduced these exhibits at some point in the litigation. The Judge offered this evidence in direct violation of Arkansas Rule of Evidence 105 ("Whenever evidence which is admissible as to one [1] party or for one [1] purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly").

   i.      Perhaps the worst example of this came during Day 2 of the trial. When conducting direct examination of the Defendant himself, the Defense Attorney used the forensics report that Plaintiff introduced to show evidence that somebody – who wasn't even called as a witness at that trial – had told somebody else, over the phone, that

Plaintiff had acted in a way that person considered to be excessively violent, and for that matter, did not even give any specific instances of conduct, only that Plaintiff was violent with that person. What was already heavily opinionated and conclusory was made even more inadmissible by the fact that it was not merely hearsay, but hearsay within hearsay.

ii.      Another good example came during Plaintiff's cross examination. When his attempts to get Plaintiff to testify to the University of Arkansas' hearsay accusations that Plaintiff had formulated some "grand scheme" to murder his father four years in the making, he brought it up on cross examination. Plaintiff objected to this evidence on the grounds that A) it was hearsay, and B) it was inadmissible under ARE Rule 404(b)[4]. At first, Goldie asked Plaintiff to simply admit that it was there, "whether it's true or not," suggesting that he had some other plans for this evidence, beyond simply to prove the truth of the matter asserted. However, later in that trial, when Plaintiff was trying to introduce some similar evidence, Goldie freely admitted that he introduced that evidence for the express purpose of showing that the Plaintiff held a vendetta against the Defendant, meaning that he introduced the hearsay evidence for the purpose of proving the truth of the matter asserted.

iii.      All the while, in all the times the Defense Counsel did this, he never even so much as ATTEMPTED to offer any evidence that any one of these hearsay accusations were true. The Defense Attorney's only argument for being allowed to show this evidence was "HE brought it up!" His argument was that, if Plaintiff introduces an exhibit for one purpose, then the Defense Attorney is allowed to use that exhibit for whatever purpose he likes, even if it would be inadmissible for that purpose otherwise. Moreover, he spoke as

---

4   Evidence of prior bad acts is inadmissible to show that Plaintiff acted in accordance therewith on a particular occasion.

if this was well-established law, like it was common knowledge among legal circles, and

that anyone who had a legal education regarded this legal doctrine as second-nature.

Quite frankly, Rule of Evidence 105 says the complete opposite.

(i)     The Defense Attorney objected to numerous exhibits that Plaintiff attempted to

introduce. However, he did not state any grounds for why the evidence should be

inadmissible. Instead, he argued that the evidence did not prove what Plaintiff claimed it to

prove. He then asked the Court – not the jury, but the Court – to decide which side the

evidence favored. This was a clear abuse of judicial authority. By the judge's own admission,

when it was instructing the jury on the law, it is the JURY'S job, not the judge's, to determine

the weight of the evidence.

     i.     Plaintiff was most heavily prejudiced on this matter when he attempted to

     introduce written threats made by the Defendant – either the Defendant himself, or

     through counsel – threatening to collaborate with the government to deny Plaintiff access

     to the courts. The Defense Attorney offered his own take on the matter, and the Court

     simply decided that, since he personally did not believe that the letters proved what

     Plaintiff offered them to prove, the jury was not going to get the opportunity to disagree

     with it.

(j)     Despite all of this, the Defendant himself (as opposed to, the Defense Counsel)

actually ADMITTED to every single underlying fact that was necessary to support the two

claims that remained. Despite this admission, Rogers refused to grant Plaintiff's Motion for

Directed Verdict, simply calling it a "fact question," even though, you know, the Defendant

ADMITTED TO IT! He never even attempted to explain his ruling beyond that. It was a fact

question; just shut up and accept the Judge's biased decision like a little punk.

39.     As you can clearly see, Plaintiff has suffered numerous adverse actions. Thus, if these

adverse actions can be shown to have been caused, at least in part, by Plaintiff's ADA litigation

history, then they amount to unlawful retaliation in violation of Section 503 of the Americans

with Disabilities Act.

### Sub-Section 6: Perjury No. 1 (Lying about lack of memory of night of arrest)

40.     During the discovery of the state court action, Plaintiff submitted a request for admissions

to James E. Goldie, in his official capacity as defense counsel for David D. Stebbins. This

interrogatory asked David D. Stebbins to admit to the precise chronological order of events that

happened the night Plaintiff was arrested.

41.     This was material to the proceedings at the time because, at the time, the special judge

had not sua sponte dismissed Plaintiff's malicious prosecution claim (see , and the precise

chronological order of the events surrounding Plaintiff's arrest was relevant to proving lack of

probable cause[5].

42.     Goldie, answering on behalf of David D. Stebbins, simply replied and stated "Defendant

cannot state the exact order of events."

43.     Plaintiff simultaneously served the Defendant with an Interrogatory, asking the Defendant

to state, under oath, which of his answer to the request for admissions were true. This was

designed to ensure that his answers were given under penalty of perjury. Goldie – acting on

behalf of David D. Stebbins – replied and stated "all responses are true."

44.     However, when the jury trial actually got underway, the Defendant testified and stated the

exact order of events, precisely as Plaintiff asked the Defendant to admit in the request for

---

5   See Kuehl v. Burtis, 173 F. 3d 646, 650 (8th Cir. 1999): "[L]aw enforcement officers have a duty to conduct a
reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances
and so long as 'law enforcement would not [be] unduly hampered ... if the agents ... wait to obtain more facts
before seeking to arrest.'"

admissions, creating an inconsistency with his previous, under-oath response to his interrogatory.

### Sub-Section 7: Perjury No. 2 (Lying about Plaintiff's bargaining power)

45.     In addition to malicious prosecution, Plaintiff was suing David D. Stebbins for breach of

contract. He asked the David D. Stebbins, on two separate occasions during discovery, to admit

that Plaintiff had no bargaining power to negotiate the terms of the contract, and had no choice

but to accept David D. Stebbins' terms. This was done to prove that the contract was

unconscionable, and thus, should have been voidable in Plaintiff's favor.

46.     On both occasions, Goldie (acting on behalf of David D. Stebbins) stated that Plaintiff

had bargaining power. On the second time, Plaintiff asked the Defendant to justify his answer by

stating what "meaningful alternatives" Plaintiff had (by using the exact phrase "meaningful

alternative," Plaintiff was in the hopes that he could put the two on notice that he was asking

them to refute a presumption of unconscionability). Goldie – acting on behalf of David D.

Stebbins – simply said "Plaintiff did not have to accept any contract or could have sought

another contract."

47.     However, both of these statements were contradicted by David D. Stebbins' own

testimony at the jury trial, where he freely admitted that Plaintiff was faced with a choice

between accepting David D. Stebbins' extremely one-sided terms, or being literally homeless.

48.     This means that, by David D. Stebbins' own admission, his two previous discovery

responses were lies.

### Sub-Section 8: Perjury Nos. 3, 4, & 5

49.     Plaintiff is aware that, in 2006, David D. Stebbins had his driver's license revoked

pursuant to a DUI charge. To get his driver's license back, the Defendant was ordered to attend

an Alcoholics Anonymous (or AA for short) session.

50.     Plaintiff is also aware that the Defendant never attended this session, instead opting to
drive his own vehicle, anyway, even without a driver's license. Plaintiff knows this because
David D. Stebbins often gloats about how he "doesn't need" the AA session, since he "already
learned his lesson."

51.     Plaintiff attempted to draw attention to that, during the jury trial, since it was relevant,
under Arkansas Rule of Evidence #406 to show that David D. Stebbins considered himself above
the law.

52.     However, when the jury trial got underway, David D. Stebbins made the following
statements, under penalty of perjury:

    (a)     He does not drive (specifically because he has no license), and

    (b)     He attended the AA session, but

    (c)     He still does not have a driver's license because it costs too much to renew.

53.     All three of these statements were bald-faced lies, done to cover the fact he considers
himself above the law. He does indeed drive himself on a regular basis; he never attended the
court-mandated AA session BECAUSE he did not believe he deserved to have to go, and the
reason he never renewed his driver's license is not because he cannot afford to do so (it would
only cost twenty bucks), but because he knew they would not give it to him without a certificate
of completion from said AA session, which he had no intention of attending.

### Sub-Section 9: Perjury Nos. 6 & 7 (David D. Stebbins' perjury about his drinking habits & the speed at which alcohol leaves the human body)

54.     During the jury trial, Plaintiff attempted to use David D. Stebbins' drinking habits to
show that the Defendant was intoxicated at the time of the altercation that resulted in Plaintiff's
arrest.

55.     The Defendant affirmatively denied that he was intoxicated. However, to support this denial, he said the following two things:

   (a)     He only drinks about four 12oz cans of beer per day, and

   (b)     Beer exists the human body at a rate of 2 "beers[6]" per hour, that this is a flat rate,
   independent of gender, body size, or anything else that is specific to the individual. To
   support this pseudo-science, he said that he learned this at his AA session.

56.     The second one is already a lie. First of all, as stated before, he never attended the AA session. However, even if we were to believe him on that count, it is still completely ludicrous to think that alcohol exits all human bodies at the same rate.

57.     However, the first statement also contradicts a statement the Defendant made only a few minutes later: When asked exactly how much alcohol he purchases (since it would go without saying that he consumes that much alcohol, because what's the point of purchasing alcohol if you're not going to drink it), he said it was "two cases per week." When asked how many beer cans were in a case, he replied "thirty." This meant that he purchases (and, by proxy, consumes) sixty (60) cans of beer per week. This comes out to a little bit more than eight (8) cans per day (because 56 cans per week would be exactly 8 cans per day).

58.     This is an enormous inconsistency, since no matter how long it takes for alcohol to leave his body, he would stay intoxicated for twice as long, after drinking eight cans of beer, than if he only drank four, significantly decreasing the likelihood that he would have sobered up by the time the altercation happened that resulted in Plaintiff's arrest.

### Sub-Section 10: The Judicial Remarks showing ADA Retaliation

59.     On May 22, 2015, after the jury had entered its verdict, Plaintiff filed, in his state court

---

6   Plaintiff assumes that, by "beer," David D. Stebbins was referring to a standard 12oz can of beer.

action, a "Motion for Judgment NOV or in the Alternative for New Trial." As this Court may

have guessed, that motion was denied. Specifically, it was denied on June 8, 2015. However,

when issuing his advisory opinion, Special Judge Russel Rogers made the following comments

about Plaintiff: "Mr. Stebbins uses his medical condition, if such truly exists, as a weapon ... I

believe him to be not just a nuisance but, far more importantly, a danger to himself and to

others."

60.     The "medical condition" Rogers was referring to was Plaintiff's Asperger Syndrome,

which is what sparked Plaintiff's large number of otherwise legitimate and good-faith lawsuits

(see ¶ 3 of this Complaint, and all the previous pleadings that it incorporates). However, although

he made clear his reasons for why he felt Plaintiff was a "nuisance," his accusation that Plaintiff

was "a danger to himself and to others" came entirely out of nowhere, without any factual basis,

whatsoever (with or without evidence).

61.     On June 11, 2015, Plaintiff filed a "Second Motion for New Trial and to Recuse,"

pointing out to Rogers that Plaintiff has the absolute right to an impartial judiciary (see Tumey v.

Ohio, 273 US 510, 535 (1927), upholding this right "[n]o matter what the evidence was against

him").

### Sub-Section 11: Goldie's and David D. Stebbins' *ex parte* communication with the special judge, & the destruction of evidence

62.     On June 15, 2015, James E. Goldie – acting as defense counsel for David D. Stebbins –

filed his answer to Plaintiff's "Second Motion for New Trial and to Recuse." In this answer,

Goldie made the following statement:

> "The Court was well aware that after the jury verdict the Plaintiff within twenty-
> four (24) hours drank a substantial amount of bleach as a suicide attempt-"

63.     Plaintiff quickly reasoned the following things:

(a)     There are any number of ways that Rogers could have heard this rumor.

(b)     However, at no point, on the record, did Rogers ever state that he knew of this event.

(c)     Thus, even if Goldie may have known of the event, also, how could Goldie possibly have known that Rogers also knew of the event?

(d)     Since there was never any communication, on the record, where Rogers announced that he knew of the event, then the two had to have had the conversation OFF THE RECORD!

(e)     They live and work 180 miles apart from each other. As a result, it is extremely unlikely that they were just friends, and therefore, their conversation was, almost certainly, not a "social call." Instead, it was much, much more likely that the two were discussing case-related materials.

(f)     The odds that they were discussing case-related materials is made even more probable by the fact that Plaintiff's actions, after the jury verdict, somehow became relevant in their conversation. If they're going to discuss something Plaintiff may or may not have done after the jury verdict, they were, in all likelihood, already talking about Plaintiff to begin with.

64.     Plaintiff sent Rogers and Goldie both an email explaining to them how he figured this all out, and threatening continue legal action (such as this here lawsuit) if they did not either explain themselves, or grant Plaintiff's Second Motion for New Trial and to Recuse.

65.     On Jun 26, 2015, Russel Rogers issued an advisory letter, showing several ex parte communications besides these. Almost all of these emails between Goldie and Rogers were directly addressing the merits of the case, and yet, Plaintiff had previously received copies of NONE of these. Just a handful of quotes from these emails which show them directly addressing the merits of the state court case:

(a)      "I just got the letter yesterday. I then contacted the Clerk as to the jury costs. The clerk was not available both yesterday and today. I cannot do the impossible." Offered as an excuse as to why he did not fulfill his obligations in a timely manner. Thus, it is merits-related.

(b)      "Unfortunately, the Plaintiff does not realize that the judge is not an 'officer' under the terms of the Webb Order and the statute that allows attorney fees in contract cases cannot be waived in advance by Judge Webb." Clearly providing a counter-argument to the merits of Plaintiff's "Response To Motion And Brief On Juror Compensation And Court Reporter Charge," filed on May 28, 2015 at 1:03PM.

(c)      "Of course that means police officers and not the Judge. Also, Judge Webb cannot in advance waive any attorney fees that the statute on contracts allows." Again, arguing against the merits of Plaintiff's on-record response.

66.      So before, Plaintiff was merely speculating that Goldie's discussions with Williams (and, by proxy, with Judge Rogers) were case-related; now we KNOW they were case-related, and thus, a patent violation of Plaintiff's absolute right to an impartial judiciary.

67.      One July 6, 2015, Plaintiff received a copy of an order recusing himself from the proceedings. This means that he admits that the issue of *ex parte* contacts (and the potential that it might have impaired his judgment) has merit. However, he chose not to rule on Plaintiff's Second Motion for New Trial. Instead, he chose to defer the motion to the succeeding judge.

68.      Only problem is ... the Motion had to get a ruling by July 10, 2015, otherwise, it is denied by default. See Ark.R.Civ.P. 59(b) "If the court neither grants nor denies the motion within 30 days of the date on which it is filed or treated as filed, it shall be deemed denied as of the 30th day." So, even when he is admitting that Plaintiff got a raw deal, he is still using his self-

admitted hatred of Plaintiff to screw him over. He has found a loophole so that the prejudicial

judgment still remains on the record, while he technically gets to wash his hands of the matter.

69.     Under most circumstances, this would be considered clever, because judicial immunity

would protect him. However, since his search for the loophole was fueled by his hatred towards

Plaintiff, and said hatred was, by proxy, fueled by at least one of Plaintiff's statutorily protected

activities, that means that the search for the loophole was an unlawful act of retaliation (for

which there is no judicial immunity; see Section III of this Complaint), even if the loophole itself

was not illegal in and of itself.

70.     In his June 26 email, Rogers did not produce the emails that were actually spoken of in

the June 19, 2015-dated letter from Goldie (you know … where he tried to explain how he knew

what Rogers knew without admitting to ex parte communications). Rogers said that this email

was "unavailable."

71.     In other words … it was deleted.

72.     It could not possibly have simply been overwritten automatically to make space.

Williams has a Gmail email account. Even the free account from gmail allows storage space up

to 30GB. See https://support.google.com/mail/answer/6558?hl=en ("If your Google Account is

through work or school, you have at least 30GB of storage").

73.     If you know anything about computers, you know that this means she would have to send

and/or received at least 1,200 emails (and that's assuming that each email contained the

maximum allotted 25MB attachments) before the account would have to automatically delete

emails to make room. The odds that she could blow through such a high quota in only a few

months is astronomical; to achieve that, her entire 40-hour-a-week job would have to be nothing

but sending outing and reading incoming email, without any time spent doing actual secretary

work.

74.    No, she *deleted* it, most likely in the hopes that Plaintiff wouldn't be able to use it as

evidence. Fortunately, Plaintiff already has plenty of evidence of ex parte communications (as

demonstrated in ¶¶ 60 & 61 of this Complaint), and besides, Goldie has already issued a written

confession to this email.

75.    However, she still deleted it. She deserves to be punished as a matter of principle.

### Sub-Section 12: Rogers' Attempt to Have Plaintiff Committed, and additional acts of discrimination on basis of perceived disability.

76.    On July 7, 2015, Plaintiff received, by regular mail, a letter from Russel Rogers. In this

letter, he gave even more hate-filled remarks about Plaintiff, including the following paragraph:

> "The Plaintiff is suffering from a condition that I believe (from over 40 years of
> dealing with disturbed people) is more serious than Aspergers alone. He is most
> likely homicidal, is definitely suicidal, as well as paranoid and delusional. I am
> therefore sending a copy of this to the prosecuting attorney and to the Department
> of Human Services. I have been tempted to declare Mr. Stebbins incompetent on
> my own notion but believe that it is best to refer it to the proper authorities in
> Boone County."

77.    So, what we have here is Russel Rogers, by his own admission, issuing adverse rulings

and denying Plaintiff justice, by reason of his belief that Plaintiff has a disability, and he isn't

even PRETENDING like it's more than that.

78.    He also has stated that he is forwarding a copy of these accusations to the prosecuting

attorney for the Fourteenth Judicial Circuit of the State of Arkansas, as well as the Arkansas

Department of Human Services. His goal, undoubtedly, was to have Plaintiff "declared

incompetent" and to have him committed in the State Hospital. It is this action – the forwarding

of these accusations to the prosecutor with hopes of having Plaintiff committed – that form the

basis of Plaintiff's common law personal capacity malicious prosecution and defamation claims.

79.    Plaintiff will, in all likelihood, suffer an increase in government surveillance as a result of this accusation. They can't do anything yet, but they will certainly be monitoring Plaintiff in light of these accusations.

### Sub-Section 13: Gordon Webb's First Amendment Censorship

80.    On July 20, 2015, Gordon Webb – who had already recused himself from this case, mind you – had filed an order in the state case (claiming to be acting as administrative judge of the Fourteenth Judicial Circuit), ordering that the case was closed and that no party was to file anything further in the case except as it directly related to appeal.

81.    That was fine. Plaintiff is not suing for that. What he is suing for is another mandate made in the same order: Plaintiff was not allowed to even so much as discuss the case with any court staff, using ANY means of communication, including writing for a newspaper or blogging over the Internet to vent about the government corruption!

82.    That is NOT a legitimate exercise of his authority to control the court's docket. To the contrary, it seems that he is simply trying to shoe Plaintiff out because he finds Plaintiff to be annoying. Credence is lent to this by the fact that Gordon Webb, in issuing that order, accused Plaintiff of harassing the Court ... something Plaintiff has absolutely NOT done! There is a difference between a person harassing another person, and the second person simply being annoyed by the first person's otherwise perfectly lawful behavior. This is a case of the latter, and Gordon Webb is intentionally restricting Plaintiff's rights under the Free Speech and Petition Clauses of the 1st Amendment, simply because he does not like Plaintiff.

### Sub-Section 14: Brad Karren's Retaliation and Acts Taken in Complete Absence of Jurisdiction

83.    The contents of Doc. 2 and Doc. 3 (Plaintiff's Complaint & Jury Demand, as well as

Plaintiff's Amended Complaint & Jury Demand) are hereby incorporated by reference. Plaintiff is not abandoning any claims or legal arguments; he is adding to them. Please do not read this complaint as abandoning any existing claims, because they are not intended to be taken as such.

84.     On June 24, 2015, Special Judge Brad Karren – who is normally a circuit judge in Bentonville – was assigned, by Donna Gay and Jim Hannah, as special judge in Case No. CV2015-38-4 in the Boone County Circuit Court, in which Plaintiff was also a pro se party. The order of assignment made it perfectly clear that he had no authority in the Boone County Circuit Court beyond that one specific case.

85.     On August 4, 2015, a motions hearing was held in that case. He had arranged for the Boone County Circuit Clerk to be present at the hearing.

86.     After oral argument, Karren freely admitted to having looked up Plaintiff's litigation history on PACER. He then proceeded to dismiss the Plaintiff's complaint, with prejudice. Officially, he did so on the grounds of collateral estoppel, a grounds not even raised by the Defense prior to the evidence hearing.

87.     He then proceeded to act entirely outside of his jurisdiction, usurp the position of Administrative Judge of the 14th Judicial Circuit, and bar Plaintiff from filing any more pro se lawsuits in the Boone County Circuit Court. He gave no explanation as to the basis of this sanction other than he did not believe that Plaintiff had properly researched the law (as if he expected Plaintiff to magically be aware of the fact that A) he was going to raise an affirmative defense sua sponte, and B) he was going to use Montana law).

88.     He explained that the reason he asked the Clerk to be present for the hearing was so she could be aware of this particular sanction.

89.     Plaintiff begged the judge for an opportunity to be heard, as he was entitled under Rule

11(c)(6) of the Arkansas Rules of Civil Procedure, but he replied with a one-word answer: "No."

90.     He then stormed out of the courtroom without hearing another word. He refused to give Plaintiff even ONE SECOND to argue his case.

91.     On August 5, 2015, Plaintiff filed a Motion for Reconsideration.  However, Brad Karren denied that motion with no explanation.

### Sub-Section 15: Perjury No. 8: Gordon Webb's Personal Capacity Perjury

92.     When the case against David D. Stebbins was getting ready to go to trial, he attempted to subpoena Gordon Webb to testify as a witness.  Through leading questions (since he would have been a hostile witness) and impeachment of testimony through exhibits, Plaintiff planned to prove that not only was the arrest and criminal charges pre-determined, but Gordon Webb was part of the conspiracy against Plaintiff.

93.     However, Gordon Webb moved to quash the subpoena Plaintiff issued to him.  As you may have guessed, this Motion to Quash was granted without Plaintiff being given an opportunity to file an Answer to it; that was one of the many "adverse actions" that Plaintiff is currently suing Russel Rogers for under Sec. 503 of the Americans with Disabilities Act.

94.     However, for purposes of this sub-section, it is important to know that Gordon Webb committed an act of perjury when he stated, as part of a notarized affidavit that was attached as an exhibit to that motion, that he had no knowledge of Plaintiff's malicious prosecution case, outside of what was on the record in that case and the criminal case.

95.     He then argued that, because he cannot be made to testify about his official rulings (citing Arkansas *dicta* that was not even binding precedent), he should, therefore, be privileged from testifying.

96.     The statement spoken of in ¶ 88 was a flat-out lie.  He claimed lack of knowledge so he

couldn't be cornered with evidence he couldn't refute.

97.     Plaintiff had the evidence, then, that Gordon Webb was in on the conspiracy, and he has still has that evidence to this day.  Plaintiff will afford Gordon Webb a brief discovery, and then hit him with a Motion for Summary Judgment.

### Sub-Section 9: Wes Bradford's Personal Capacity Perjury

98.     Wes Bradford also moved to quash his subpoena. That motion to quash was granted the same day it was entered, before Plaintiff even knew it existed.

99.     In the affidavit in support of that motion to quash, Bradford stated that he had "no knowledge as to whether [Plaintiff]'s prosecution was malicious."

100.    If you've been paying attention AT ALL for this entire Complaint, you would already know that this is a bald faced lie.  Bradford had the MOST knowledge as to whether the arrest and criminal charges were party of a conspiracy to get Plaintiff to stop filing lawsuits. He may have had *exonerating* evidence that David D. Stebbins (the only defendant in that case) had no part in it, but to say that he had no knowledge, one way or another, about the matter is total nonsense.

### Sub-Section 10: City of Harrison's near-arrest in violation of 4th & 5th Amendments

101.    Here is an example of the sort of increased government surveillance Plaintiff has already begun to suffer, most likely in connection with Rogers' defamation and malicious prosecution.

102.    On August 12, 2015, Plaintiff had stepped outside of his apartment for a brief moment, for some fresh air and some room to walk around (since his apartment is cramped). There was no rhyme or reason for Plaintiff's impromptu decision to step outside; he just did it because he felt like it.

103.    After a couple of minutes, two police officers who Plaintiff now knows to be named

Robert Turley and Josh Applegate approached Plaintiff and started accosting him. They were extremely authoritative in their demands for information, and so Plaintiff advised them that he was not going to answer any questions, pursuant to his Fifth Amendment right to silence, until he knew exactly what hew as being accused of. The cops continued to demand Plaintiff's name (they most likely already knew it), and Plaintiff repeatedly advised them that he was pleading the fifth.

104.    Two cops (Plaintiff does not know their names; these are the first two of Plaintiff's "three unknown-named police officers; he will acquire their identities, and serve them with process accordingly either in a discovery or a subpoena duces tecum) then proceeded to place Plaintiff under arrest. The younger of the two cops had his hand wrapped around Plaintiff's wrist and was about to handcuff Plaintiff.  Out of desperation, Plaintiff agreed to let the two cops have what they wanted and allowed them to see his ID. They then released Plaintiff.

105.    Plaintiff walked to the police department and demanded to see a supervisor.  Months prior to this, Plaintiff received, from Mayor Secretary Christeen Waters, a copy of the City's comprehensive grievance procedure, so Plaintiff expected his 1st Amendment right to complain and went down to the police department.

106.    Plaintiff talked to a man who he now knows to be Sgt. Waldon, though Plaintiff still does not know his first name (this is the "unknown-named police officer").  He told Plaintiff that, if a police officer asks a citizen his name, and the citizen does not tell him, that amounts to the crime of "obstructing governmental operations." Plaintiff tried to explain to him that, if that law is indeed on the books (more on that in a minute), it is unconstitutional because Plaintiff has the fifth amendment right to not talk to police, and it goes without saying that a citizen cannot be punished for exercising his constitutional rights. Waldon said that he believed that, if the law was

unconstitutional, "they[7]" would have amended it.

107.    Having received enough information to create an unconstitutional municipal policy or custom, Plaintiff departed for his apartment again. He arrived home at around 4:50PM, when all the attorneys were getting ready to go home, so he could not call an attorney at that moment in time, but he took the remainder of that night to do legal research to confirm his existing beliefs about the law being unconstitutional.

108.    In addition to finding the precedents of *Brown v. Texas* and *Hiibel v. Sixth Judicial District Court of Nevada*, both of which will be discussed in-depth in Section V of this Single Complaint. However, for purposes of *this* section (setting forth the relevant facts), Plaintiff also found the following:

(a)    There remain, in the Arkansas Code, to this day, laws that prohibit abortion as well as the desecration of the Arkansas Flag (see A.C.A. § 5-61-102 and A.C.A. § 5-51-208, respectively), even though those laws have been declared unconstitutional by *Roe v. Wade*, 410 U.S. 113 (1973) and *Texas v. Johnson*, 491 U.S. 397 (1989), respectively!

i.    See, a Supreme Court decision declaring a law unconstitutional is NOT treated, by federal courts, as an injunction directed to state legislatures to pass legislation repealing their version of the unconstitutional laws.  Instead, as long as those laws are not being enforced, the precedent declaring the law unconstitutional is technically being complied with; see *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) (you need to be injured before you have standing to sue).  The burden of complying with THAT requirement falls entirely onto the police in the first instance.

ii.    Thus, Sgt. Waldon's belief that a law would be repealed if it's unconstitutional is

---

7    Plaintiff assumes that, by "they," he means the Arkansas General Assembly.

flawed at its very inception. He cannot rely on the mere fact that a law is on the books as an excuse to enforce a clearly-unconstitutional statute.

(b)    Plaintiff checked the Arkansas statute titled "obstructing governmental operations." At no point, in the statute, did it say that a failure to give a name when asked to by police constituted a violation of the statute; rather, the act of *falsely identifying oneself* is what violates the statute! See A.C.A. § 5-54-102(a)(4)

   i.      You do not even have to be an attorney to understand that "refusal to answer any questions at all" and "telling a lie in response to a question" are not even remotely close to the same thing.

   ii.     So, even if the U.S. Supreme Court has determined that these "stop and identify" laws are constitutional, the simple bottom line is that the State of Arkansas does not have that law.  Whatever their reason for not having it, the bottom line is that they don't have it. They could pass it at any time, but they haven't done so yet.  So, the police can go shove it.

109.    So, what we have here is a couple of police officers *literally usurping* the position of legislature, creating a new law out of thin air, and arresting Plaintiff for that non-existent law. Moreover, Sgt. Waldon is covering for their actions, per municipal custom.

110.    Plaintiff attempted, yet again, to resolve the matter without court action and filed a formal complaint with the Harrison City Police Department, but Harrison Police Chief Paul Woodruff, on September 4, 2015, issued a report, once again attempting to cover for the officers. In his report, he stated that the officers were investigating a violation of a protection order.  This is, most likely, a pretextual excuse made up in response to the complaint, for reasons that will be discussed in Section V, Sub-Section 14 of this Single Complaint. However, what's more

important is that he stated that "Stebbins' evasive actions caused them to believe he could be the suspect." So basically, Chief Woodruff is holding that A) Turley and Applegate did indeed nearly arrest Plaintiff *because* he exercised his Fifth Amendment right to silence ... that they did not simply reason, through their own investigations, that Plaintiff was the culprit. Rather, they formed that belief *only after* Plaintiff exercised his Fourth and Fifth Amendment rights, and B) this was entirely within Harrison City Policy.

111.    It is also important to note that the arrest reports for the protection order contained the following narrative about what happened:

> "On Wednesday Augsut 12, 2015, I, Ptl. J. Applegate, was dispatched to 123W. Ridge St., in reference to a Robert Periman ... violating a protection order ...
>
> I followed the North to the apartment building where Periman was. North unlocked the door to Apartment C so I could gain entry to contact Periman. I entered the residence and started up a flight of stairs where Periman walked over to the top of the stair case. I asked if he was Robert Perian, he said yes he was. I told Periman to turn around and place his hands behind his back and that he was under arrest for Violation of Protection order."

112.    Bear this in mind when reviewing Section V, Sub-Section 14 of this Single Complaint.

### SECTION V: LAW AND DISCUSSION

113.    The following law governs Plaintiff's causes of action:

### Sub-Section 1: ADA Retaliation #1
### (criminal charges were retaliation against litigation history)

114.    To prevail on a claim of ADA Retaliation, Plaintiff must prove three (3) essential elements: (1) that he engaged in one or more statutorily protected activities, (2) that he suffered an adverse action, and (3) the adverse action was caused, at least in part, by the statutorily protected activity. See *Amir v. St. Louis University*, 184 F. 3d 1017 (8th Cir. 1999).

115.    Plaintiff has sufficiently plead the element of "statutorily protected activity" in Section

IV, Sub-Section 1 of this Complaint.

116.    Plaintiff has sufficiently plead the element of "adverse action" against Wes Bradford, in

Section IV, Sub-Section 2 of this Complaint.

117.    Plaintiff has also sufficiently plead the element of "causal connection" in Section IV, Sub-

Section 2 of this Complaint.  Even if the criminal charges were not brought 100% with the

intention of getting Plaintiff to stop exercising his Constitutional right to court access, that was

still at least 0.00000000000000000000001% part of Bradford's agenda, and as Plaintiff

pointed out in ¶¶ 9-11 of this Complaint (especially Footnote #3), that is all it takes.  The *extent*

to which Plaintiff's statutorily protected activities played a role in the criminal charges may

mitigate the damages, but that is a question of fact. As a matter of law, Plaintiff's statutorily

protected activities played *a roll*, and therefore, Plaintiff is entitled to have litigation to determine

"how much."

118.    Therefore, Plaintiff has sufficiently plead facts upon which he can recover for a claim of

ADA Retaliation.

119.    State of Arkansas is vicariously liable for this retaliation to the same extent as Wes

Bradford is.  Because there is no immunity for ADA discrimination & retaliation claims, and

"remedies (including remedies both at law and in equity) are available for such a violation to the

same extent as such remedies are available for such a violation in an action against any public or

private entity other than a State" (see 42 USC § 12202), the State of Arkansas is liable, the same

as any other employer would be liable under the doctrine of *respondiat superior.*

### Sub-Section 2: ADA Retaliation #2
### (Goldie & David D. Stebbins sought bar of court access in response to litigation history)

120.    James E. Goldie – acting on behalf of David D. Stebbins – sought for Plaintiff to be

barred court access on account of his statutorily protected activities. The elements of retaliation in this case are self-explanatory.

121.    David D. Stebbins is vicariously liable for the acts of James E. Goldie, under the attorney-client relationship. See *Link v. Wabash R. Co.*, 370 US 626, 633-634 (1962). See also *Inman v. American Home Furniture Placement, Inc.*, 120 F. 3d 117, 118-119 (8th Cir. 1997).

### Sub-Section 3: ADA Retaliation #3
### (Russel Rogers adverse rulings due to litigation history)

122.    Plaintiff has sufficiently plead the element of "statutorily protected activity" in Section IV, Sub-Section 1 of this Complaint.

123.    Plaintiff spent a great deal of time outlining the numerous adverse actions Russel Rogers subjected Plaintiff to.  Therefore, that element is sufficiently plead, as well.

124.    This leaves just the element of "causal connection." In an extremely rare occurrence, the Defendant has actually *admitted* to this element, as discussed in Section IV: Sub-Section 10 of this Complaint.

125.    Therefore, Plaintiff has sufficiently plead the elements of ADA retaliation, and is entitled to recover on them.

### Sub-Section 4: ADA Retaliation #4
### (Brad Karren adverse rulings due to litigation history)

126.    Plaintiff has sufficiently plead the element of "statutorily protected activity" in Section IV, Sub-Section 1 of this Complaint.  Furthermore, since Karren freely admitted to having looked up Plaintiff's litigation history on PACER, it stands to reason that Karren knew about Plaintiff's statutorily protected activities.

127.    The adverse actions are clearly plead, in Section IV, Sub-Section 14 of this Complaint.

128.    This leaves us with the element of causal connection.  This time, the Defendant has not

admitted to using Plaintiff's statutorily protected activities to motivate his decision  However,

Plaintiff believes that there is sufficient circumstantial evidence to support this element.

129.    The circumstantial evidence of the element of "causal connection" is thus:

    (a)    He issued Plaintiff the most extreme sanction he could: Permanent barring of filing

    *pro se* lawsuits, altogether.  The odds that he would have done this on just one case alone is

    one in a million; it is not a sufficient odds to survive summary judgment.

    (b)    He never gave any explanation as to how he reached his conclusion that Plaintiff's

    lawsuit was filed in violation of Rule 11 of the Arkansas Rules of Civil Procedure …

    suggesting that he has something to hide.

    (c)    He did not allow Plaintiff an opportunity to be heard.  Again, such drastic measures

    are usually not resorted to on the first case.

130.    Therefore, the odds are a million to one that Karren was acting, at least partially, on the

frustration he felt in reviewing Plaintiff's litigation history.

131.    Therefore, Plaintiff has plead sufficient facts upon which a jury could conclude that Brad

Karren had committed unlawful retaliation against Plaintiff.

### Sub-Section 5: Title II ADA Discrimination #1
### (criminal charges were maintained in response to perceived mental disability)

132.    When confronted about the plea bargain spoken of in ¶¶ 26-28 of this Complaint, he

explained, to Plaintiff's counsel, that he wanted this because he believed Plaintiff to have a

"mental health issue" that compels Plaintiff to file frivolous lawsuits.  This is sufficient to qualify

Plaintiff as a "person with a disability" according to the statutory definition given in the ADA

Amendments Act of 2008. See 42 USC § 12102(3) (declaring that being "Regarded as having

such an impairment" is sufficient to qualify the Plaintiff as disabled, regardless of whether or not he actually has the impairment).

133.    Plaintiff has also sufficiently plead the element of "adverse action." Specifically, Bradford continued the criminal charges because Plaintiff would not agree to abolish what he personally considered to be a disability.

134.    In a motions hearing dated November 30, 2012, Bradford attempted to make the argument that, because he is not *required* to offer any plea bargains, he should be allowed to make whatever demands he wants in those plea offers, without it being discrimination or retaliation. As a matter of law, this argument is patently without merit, and has been rejected by numerous Supreme Court cases over the past century. Just a sample of the cases that have rejected this argument are …

    (a)    Perry v. Sindermann, 408 US 593, 597 (1972)

    (b)    Speiser v. Randall, 357 US 513, 526 (1958)

    (c)    Sherbert v. Verner, 374 US 398, 404-405 (1963)

    (d)    Shapiro v. Thompson, 394 US 618, 627 (1969)

    (e)    Graham v. Richardson, 403 US 365, 374 (1971)

    (f)    Public Workers v. Mitchell, 330 US 75, 100 (1947)

    (g)    Wieman v. Updegraff, 344 US 183, 192 (1952)

    (h)    Shelton v. Tucker, 364 US 479, 480 (1960)

    (i)    Torcaso v. Watkins, 367 US 488, 495-496 (1961)

    (j)    Cafeteria & Restaurant Workers v. McElroy, 367 US 886, 894 (1961)

135.    And since Bradford has freely admitted to making the plea demand because of the perceived disability, the element of "causal connection" is not in dispute, even if it may or may

not be in dispute when it concerns the adverse action of "initiation of criminal proceedings."

### Sub-Section 6: Title II ADA Discrimination #2
### (Russel Rogers adverse actions due to perceived mental health issue)

136.    Russel Rogers claimed that he believed Plaintiff to have a far more severe mental

disorder than Aspergers alone.  He implied that he believed Plaintiff to have Antisocial Person-

ality Disorder, though he never gave the name.  Nevertheless, his declaration is sufficient to

qualify Plaintiff as a "person with a disability," even though Plaintiff does not have ASPD, for

the same reasons as are discussed in ¶ 116 of this Complaint (Bradford's perception of Plaintiff's

disability).

137.    Russel Rogers freely admits that he issued the rulings he did, primarily because of this

perceived mental disorder. Therefore, the elements of "adverse action" and "causal connection"

are proven beyond genuine dispute.

138.    Therefore, Plaintiff has sufficiently plead a *prima facie* case of discrimination in violation

of Title II of the Americans with Disabilities Act.

139.    Rogers has alleged sufficient facts that, if true, would entitle him to the affirmative

defense of "direct threat."  However, this defense lacks merit for the following reasons:

(a)     The law requires there be an *actual* threat, not merely a perceived one, and it must be

"based on reasonable medical judgments given the state of medical knowledge." See *School

Bd. of Nassau Cty. v. Arline*, 480 US 273, 288 (1987). See also *EEOC v. Wal-Mart Stores,

Inc.*, 477 F. 3d 561, 571 (8th Cir. 2007) ("The Supreme Court requires an individualized direct

threat analysis that relies on the best current medical or other objective evidence in order to

protect disabled individuals from discrimination based on prejudice, stereotypes, or

unfounded fear"). Since Rogers never had Plaintiff attend any medical evaluation, he cannot

use this defense, even if he has Plaintiff attend one in this case and it proves him right! Because it is common knowledge that you cannot base your discriminatory acts on information you did not have until after the discrimination occurred.

(b)     For that matter, Plaintiff had already attended a mental health evaluation in Little Rock, in connection with the criminal case. He was not diagnosed with anything that would cause him to be "homicidal." That forensics report was introduced as an exhibit at the jury trial Rogers presided over, meaning he was *made privy to evidence that plainly refuted his claims*!

140.    Therefore, he will not likely be able to prove this affirmative defense (and yes, the burden of proof will lie on the Defendant in this case; Plaintiff will not have to prove he is not a danger to others; Rogers will have to prove that he is; see EEOC v. Walmart, supra at 571 ("we now hold that the employer bears the burden of proof, as the direct threat defense is an affirmative defense").

### Sub-Section 7: Personal Capacity Malicious Prosecution

141.    Rogers claimed that he was submitting a copy of these accusations to the prosecutor and Department of Human Services in hopes of having Plaintiff committed to an asylum. This is not an act "normally performed by a judge;" to the contrary, anybody can do that, as it is part of the First Amendment right to petition the government for a redress of grievances. Thus, it does not fall within the definition of a "judicial act," as defined by the precedent of Stump v. Sparkman, 435 US 349, 362 (1978). As a result, Russel Rogers has no judicial immunity in the first instance. It is not merely taken away, or waived; he never had it to begin with.

142.    To state a claim for malicious prosecution, Plaintiff must allege (and then, as the case progresses, subsequently prove) the following essential elements: (1) a proceeding instituted or

continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the

plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the

defendant, and (5) damages. See *Bank of Eureka Springs v. Evans*, 109 SW 3d 672, 690 (2003).

143.    Russel Rogers has contacted Prosecutor David Etheridge in the hopes of having Plaintiff

committed. This satisfies the first essential element.

144.    So far, the prosecutor cannot do anything, not until Plaintiff actually does something

illegal, even if he believes Plaintiff to be similarly mentally ill.  See *Robinson v. California*, 370

US 660 (1962) (striking down, as unconstitutional, a California law criminalizing the passive

state of *being* a narcotics addict, without regard to actual narcotics use, stating at one point that

"Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a

common cold"). Therefore, the second element – dismissal of Plaintiff's charges – has been

satisfied by means of *nolle prossed*.

145.    The essential element of "absence of probable cause" is satisfied in two ways, either one

of which are singlehandedly sufficient to satisfy this element:

   (a)     First, the accusation of being homicidal is total nonsense.  For the reasons discussed

   in ¶ 123(a), he submitted this accusation with absolutely no evidence to support it.

   (b)     Also as stated in ¶ 123(b), he was made privy to a medical diagnosis that refuted his

   claims. Binding precedent in the 8th Circuit clearly states that probable cause does not exist

   in the face of "plainly exculpatory evidence." See *Kuehl v. Burtis*, 173 F. 3d 646, 650 (8th Cir.

   1999).

146.    If you think Plaintiff even *has* to explain how the element of "malice" is sufficiently

plead, you obviously haven't been reading this complaint at all.

147.    And finally, the issue of damages. Although it appears unlikely that Plaintiff will be

*arrested*, there is a very good chance that Etheridge will keep a closer eye on Plaintiff than he would have, but for this complaint. Therefore, Plaintiff has suffered the injury of "increased government surveillance."

148.    Therefore, Plaintiff has sufficiently plead the elements of malicious prosecution, and is entitled to recover against Russel Rogers in his individual capacity if he can prove the aforementioned factual allegations.

### Sub-Section 8: Personal Capacity Defamation

149.    Plaintiff is also suing Russel Rogers for a personal-capacity defamation claim. To prevail on a claim of defamation, Plaintiff must allege and subsequently prove the the following essential elements: "First, that he has sustained damages. Second, that [the Defendant] published a false statement of fact concerning [the Plaintiff]. Third, that the statement of fact was defamatory. Fourth, that [the Defendant] acted with negligence in failing to determine the truth of the statement prior to its publication or with knowledge that the statement was false. And fifth, that the publication of the statement was a proximate cause of [the Plaintiff]'s damages." See *Wal-Mart Stores, Inc. v. Lee*, 74 SW 3d 634 (2002).

150.    First element is satisfied for the reasons set forth in ¶ 131.

151.    The publishing of the statement has been sufficiently plead in Section IV, Sub-Section 12 of this Complaint.

152.    The fact that the statement was false, and that the Defendant was negligent in determining the truth of the matter, are both sufficiently plead in ¶ 129(b) of this Complaint. In fact, the fact that Rogers was made privy to a plainly exculpatory medical diagnosis, and made the accusation anyway, could easily be attributed to reckless disregard to the truth, not just negligence!

153.    And finally, the element of "proximate cause." This should also be self-explanatory; the increased government surveillance is obviously caused by the accusations that Plaintiff is going to kill somebody! What, do you think they're going to start watching Plaintiff because he's walking funny?

154.    Therefore, Plaintiff has plead sufficient facts to prevail on a claim of defamation.

### Sub-Section 9: § 1983 claim (ex parte communications)

155.    Plaintiff is NOT asserting an exclusive violation of state law. This is, indeed, a federal constitutional right.

156.    Private citizens can be held liable in federal court for violations of 42 USC § 1983. Even though that statute normally only prohibits state action, a suit under this statute against private citizens is allowed if those citizens worked alongside one or more state actors to violate Plaintiff's constitutional rights. See White v. McKinley, 519 F. 3d 806, 815-816 (8th Cir. 2008) ("Although § 1983 can only be used to remedy deprivation of rights done under the color of law, a private actor can be liable 'under § 1983 for conspiring with state officials to violate a private citizen's right[s]'").

157.    That, of course, only matters if Plaintiff can demonstrate facts sufficient to show a § 1983 claim in the first instance. "The essential elements of a § 1983 claim are (1) that the defendant(s) [either] acted under color of state law [or worked alongside one or more state actors], and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." See *Schmidt v. City of Bella Villa*, 557 F. 3d 564, 571 (8th Cir. 2009). The second element is crucial to the Court's jurisdiction, since without it, the Defendants' actions would, at best, be exclusively a violation of state law, meaning federal courts would need supplemental jurisdiction to here them (much like the perjury claims). Since Plaintiff seeks to have these actions form the

*basis* of supplemental jurisdiction, that means he needs federal question jurisdiction, and therefore, needs a violation of the U.S. Constitution.

158.    Goldie engaged in ex parte communications with Russel Rogers, through his secretary, Co-Defendant Kristie Williams. That much is undisputed.

159.    Rogers – and, by proxy, Williams – were state officers, because he was assigned a special judge. He was not a *full time* state officer, but he was a state officer nonetheless. Goldie was, undoubtedly, communicating with them in their official capacities as temporary state officers. Therefore, the first essential element is satisfied.

160.    There is only one motive he could possibly have had for not serving Plaintiff with a copy of these communications: He wanted to increase his chances of winning the case by stripping Plaintiff of his rights under adversarial process.  No other motive makes any logical sense.

161.    Just like in *Schmidt*, Plaintiff advances two constitutional rights that were violated: This time, the two rights are "judicial impartiality" and "procedural due process."

(a)    Judicial impartiality is an *absolute* right.  Even free speech has a few exceptions to it, but a person's right to an impartial judge cannot be taken from him under any circumstances whatsoever. See *Tumey v. Ohio*, 273 US 510, 535 (1927) ("No matter what the evidence was against him, he had the right to have an impartial judge"). Here, Rogers ultimately recused himself (while still doing so in a way that kept Plaintiff's prejudicial rulings on the books, mind you, but still recused nonetheless) because, in his own words, the *ex parte* contacts "could be seen as, however remotely, affecting [his] judgment." Thus, the *ex parte* contacts have already been determined to be the proximate cause of this constitutional violation.

(b)    Next, there is the constitutional right to procedural due process. This is the constitutional right that the ban on *ex parte* communications is designed to protect. When

Plaintiff is not served with a copy of the communications which affect him, he is denied an opportunity to do legal research and counter-argue against the arguments made in those communications. This is against the letter and spirit of the Due Process Clause. See Goldberg v. Kelly, 397 US 254, 267 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard ... and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence").

162.    Goldie could, potentially, argue that the ex parte communications were accidental, that he *thought* he had served Plaintiff with a copy of them, but it was oversight that he did not. Unfortunately, Goldie has already provided evidence to the contrary. Specifically, he countered the accusations of *ex parte* communications by ... talking about an email conversation he had with Williams that was case-related! Now consider this: If he believed that Plaintiff already been served with a copy of that email, why would he feel the need to make Plaintiff privy to it? Wouldn't Plaintiff already be privy to it? It's just like when he didn't feel the need to attach an exhibit when he made the statement about Plaintiff's suicide attempt; he didn't need to because he knew the judge already knew it. But he knew that Plaintiff *didn't* already know about that email conversation, so he had to explain it.

163.    So no, Goldie cannot avoid § 1983 liability by arguing that it was an accident. His mistake was not forgetting to serve Plaintiff with a copy of the emails; his mistake was thinking that *ex parte* communications are okay, as long as you use a liaison to do it. To that end, Plaintiff refers this court to the common law doctrine of *ignorantia juris non-excusat* ("ignorance of the law is no excuse"). This belief is patently frivolous, because by that logic, it would be legal to file a motion with the Clerk (knowing full well it would be sent to the judge), and not serve the opposing party with a copy of it, because you're using the Clerk as liaison instead of filing with

the judge directly! But of course, that's not the case.

164.    Kristie Williams is liable because she unlawfully served as liaison to facilitate this communication, despite having no plausible excuse for not realizing that this communication (and, by proxy, her involvement in it) was patently illegal. Again, even if she did not know that *ex parte* communications were illegal (which, again, is still not a defense, as every citizen is presumed to know the law), she knew Plaintiff was not made privy to these emails, as evidenced by the fact that, on April 16, 2015, she made Plaintiff privy to one. She would not have needed to do that if she thought Plaintiff was already privy to it. Thus, she knew that the communications were *ex parte*, even if she may not have known, at the time, that the legal term for it was "ex parte."

165.    Meanwhile, David D. Stebbins is jointly liable because he was Goldie's client while this communication was going on. It is black letter law that litigants are liable for the acts and omissions of their freely-retained counsel. See Siems v. City of Minneapolis, 560 F. 3d 824, 827 (8th Cir. 2009)[8]. See also Inman v. American Home Furniture Placement, Inc., 120 F. 3d 117, 118-119 (8th Cir. 1997)[9]. See also Comiskey v. JFTJ CORP., 989 F. 2d 1007, 1010 (8th Cir. 1993)[10]. See also Pioneer Investment Servs. Co. v. Brunswick Assoc., 507 U.S. 380, 396 (1993)[11]. See also Link v. Wabash R. Co., 370 US 626, 633-634 (1962)[12].

---

8   "We are not wholly unsympathetic to Siems's position. The record does not contain any evidence that Siems himself contributed in any way to the dilatory actions of his counsel. However, we have long held that litigants choose their counsel at their own peril."

9   Litigants choose counsel at their peril. While it may seem harsh to make defendants answer for their attorney's behavior, any other result would punish Inman for the inaction of her opponents' lawyer ... If they were truly diligent litigants who were misled and victimized by their attorney, they have recourse in a malpractice action.

10  "A party chooses counsel at his or her peril. Counsel's disregard of his or her professional responsibilities can lead to extinction of his or her client's claims. It is a well-established principle that a party is responsible for the actions and conduct of his or her counsel and that, under appropriate circumstances, dismissal or default may be entered against a party as a result of counsel's actions."

11  "The court also appeared to focus its analysis on whether respondents did all they reasonably could in policing the conduct of their attorney, rather than on whether their attorney, as respondents' agent, did all he reasonably could to comply with the court ordered bar date. In this, the court erred."

12  "There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's

### Sub-Section 10: § 1983 claim
### (bar of court access in complete absence of jurisdiction)

166.    The sanction to bar Plaintiff from exercising his constitutional right to court access

without paying through the nose for an expensive attorney is an act taken A) in his administrative

capacity, not his judicial capacity, and B) taken in the complete absence of all jurisdiction.

167.    It was taken in his administrative capacity because he was ordering what the Clerk can

and cannot do. It's just like Gordon Webb, ordering in his administrative capacity that Case No.

CV2012-85-4 in that case was closed. Clerks (and, by proxy, any orders given to clerks) are

ministerial officers, and thus are not protected by judicial immunity. See *Maness v. Dist. Court,*

*Logan County-Northern Div.,* 495 F. 3d 943 (8th Cir. 2007).

168.    It is taken in the complete absence of all jurisdiction because the order, from Jim Hannah,

assigning him to the case made it perfectly clear that his jurisdiction only entailed these

"additional duties" and that he would stay in the jurisdiction of his own circuit court the same as

if no assignment had been made. Therefore, for Karren to issue any ruling that was dispositive of

anything that was not before the Court in that one specific case constituted a complete usurpation

of power.

169.    It would have been one thing if he submitted a recommendation to Gordon Webb – in his

official capacity as Administrative Judge for the 14th Judicial Circuit – recommending such a

sanction. But instead, he decided to take the matter into his own hands, like a common vigilante.

### Sub-Section 11: Perjury

170.    There is an Arkansas statute allowing citizens to bring private suits for damages for

---

unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his
representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely
selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in
which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts,
notice of which can be charged upon the attorney.'"

felonies, without having to sue for their tort equivalents. This statute is codified in the Arkansas

code as Ark. Code Ann. § 16-118-107, and states the following:

> "(a) (1) Any person injured or damaged by reason of conduct of another person
> that would constitute a felony under Arkansas law may file a civil action to
> recover damages based on the conduct.
> (2) The burden of proof for showing conduct that constituted a felony shall be a
> preponderance of the evidence.
> (3) If the person who is injured or damaged prevails, he or she shall be entitled to
> recover costs and attorney's fees.
> (b) The action may be maintained by the person who was injured or damaged or,
> after the person's death, the executor, administrator, or representative of his or her
> estate.
> (c) The remedy provided in this section shall be in addition to any other remedies
> in law or equity.
> (d) This section does not apply to offenses under § 5-28-101 et seq. or the
> Medicaid Fraud Act, § 5-55-101 et seq."

171.    So, this perjury claim is indeed properly before the Court, by invoking the federal court's

supplemental jurisdiction, after Goldie and David D. Stebbins are already made Defendants by

reason of their illegal ex parte communication with Russel Rogers though Kristie Williams (this

is why Plaintiff is giving this legal argument last, even though the factual allegations to support

these claims came first). The question, therefore, is weather Plaintiff has alleged sufficient facts

to support claims for perjury.

> "(a) A person commits perjury if in any official proceeding he or she makes a
> false material statement, knowing it to be false, under an oath required or
> authorized by law.
> (b) Lack of knowledge of the materiality of the statement is not a defense to a
> charge of perjury.
> (c) Perjury is a Class C felony."

172.    Remember that it is the State of Arkansas' perjury statute, not the federal statute, that

governs in this case, because this is invoking the Court's supplemental jurisdiction. See *Murphy*

*v. LCA-Vision, Inc.*, 776 F.Supp.2d 886, 900-901 (E.D. Ark. 2011) (holding that federal felonies

are not cognizable under A.C.A § 16-118-107, even when the case is being filed in federal court).

That being said, the Arkansas state statute of Ark Code Ann. § 5-53-102 says the following:

173.    The statement does have to be "material." To that end, Ark. Code Ann. § 5-53-101(a)(1) states the following: "'False material statement' means any false statement, regardless of its admissibility under the rules of evidence, which affects or could affect the course or outcome of an official proceeding or the action or decision of a public servant in the performance of any governmental function." However, Plaintiff has already explained the relevance of these pieces of testimony & written statements, when he was laying out the facts in this Amended Complaint. Therefore, this element is sufficiently plead.

174.    For Perjuries Nos. 1, 2, and 6[13], the perjury is proven based on inconsistent statements. "When a person charged with perjury or false swearing has made inconsistent material statements under oath and affecting the same matter or transaction, all the several inconsistent material statements may be charged in different counts of the same indictment or information. Proof of the inconsistency of statements is of itself evidence that one (1) of the statements is false, and it is not necessary to sustain a conviction to establish which statement is false." See Ark. Code Ann. § 5-53-106(a)-(b). Therefore, Plaintiff has alleged sufficient facts, in those three counts of perjury, to show that the Defendant was lying in at least one of them.

175.    For Perjuries Nos. 3, 4, 5, and 7[14], Plaintiff has plead sufficiently that David D. Stebbins and James E. Goldie were lying. Furthermore, they knew they were lying, because these are not the sort of things one can say and genuinely believe them to be true. He either remembers going to the AA meeting (and thus, should have the certificate of completion to prove it; we can uncover that in discovery), or he doesn't. He either knows that he does not drive, or he knows that he does. He knows the reason he does not have his driver's license, and making up that it

---

13 Lying about how much alcohol he consumes on a daily basis. Perjury No. 7 is when he lied about how long it takes for alcohol to leave the human body.

14 This is the one where he said that alcohol exits the human body a flat, universal rate of "2 beers an hour."

costs more than twenty bucks is ludicrous.

176.    Thus, Plaintiff has alleged sufficient facts to support the seven (7) counts of perjury that apply to David D. Stebbins and James E. Goldie.

177.    Plaintiff has already alleged sufficient facts to show that Wes Bradford's testimony was a lie. Therefore, he has sufficiently plead the essential elements to support a claim of perjury against Bradford.

178.    Last but not least, there is Gordon Webb.  Plaintiff will be able to show exuberant amounts of evidence proving that Webb was made privy to the plans to get Plaintiff to stop filing lawsuits, and that he received this knowledge off the record. The evidence that Plaintiff has is so massive that for Plaintiff to even list it in this Complaint – let alone attach it – would probably double the size of this already massive document.

179.    Indeed, even at the jury trial, when Plaintiff tried to introduce all the evidence he had that Gordon Webb was part of the conspiracy, he was arbitrarily cut off from introducing any more evidence to that effect by Russel Rogers, NOT because Rogers didn't want to give Plaintiff his day in court, but because he had grown weary of all exhibits Plaintiff introduced and wanted to wrap up the jury trial within two days!  Even Court Reporter Ralenn McBee once commented "No one could have anticipated that you would have this *mountain* of evidence."

180.    So, Plaintiff humbly asks that this Court, just this once, grant an exception to the precedent of Imbler v. Pachtman (which holds that mere conclusory allegations are not entitled to presumption on truth when dismissing a complaint for failure to state a claim) and allow Plaintiff, for the time being, to proceed on the conclusory allegation that Gordon Webb was lying.

### Sub-Section 12: Tampering with Physical Evidence

181.   "A person commits the offense of tampering with physical evidence if he or she alters, destroys, suppresses, removes, or conceals any record, document, or thing with the purpose of impairing its verity, legibility, or availability in any official proceeding or investigation." See A.C.A. § 5-53-111(a).

182.   It is important to remember that, although the *title* of the crime ("Tampering with *Physical* Evidence") may suggest that evidence stored in a computer does not count, the title is not important. The language of the statute itself is what is important, and that language clearly includes "**any** record, document or thing," not just those that have a physical, tangible form.

183.   Kristie Williams destroyed additional evidence of *ex parte* communications between herself and Goldie. She has no reason for doing this; her work gmail email address provides 30GB of storage; she could not possibly have deleted these emails by running out of space, not in the time allotted. Thus, she must have deleted them *manually*, either with the *purpose* of obstructing investigations, or she acted with criminal recklessness in deleting them.

### Sub-Section 13: § 1983 claim for First Amendment Censorship

184.   In Case No. CV2012-85-4, when that case had a judgment entered in it, Gordon Webb issued a gag order to Plaintiff. Not only was Plaintiff not to *file* anything in that case, except those which are directly related to his appeal, he also ordered Plaintiff to not even *discuss* the matter with any member of the court staff! He cannot even write in the newspaper or blog on the Internet about the corruption, for fear that the court staff might see it.

185.   This was an act taken in his *administrative* capacity, not his judicial capacity. Therefore, he is not protected by judicial immunity. See *Forrester v. White*, 484 US 219 (1988).

186.   Gordon Webb was acting entirely out of line when he issued the second part of this gag order. This is not a legitimate exercise of his control over the court's docket congestion; rather, it

appears to be an attempt to rid himself of a minor annoyance.

187.     Therefore, Plaintiff has sufficiently plead the essential elements of a § 1983 claim, and is

entitled to recover damages for his loss of free speech.

### Sub-Section 14: City of Harrison's Attempted Arrest

188.     This claim is governed by the U.S. Supreme Court case of *Brown v. Texas*, 443 US 47,

49-52 (1979):

> "When the officers detained appellant for the purpose of requiring him to identify
> himself, they performed a seizure of his person subject to the requirements of the
> Fourth Amendment. In convicting appellant, the County Court necessarily found
> as a matter of fact that the officers lawfully stopped appellant. whenever a police
> officer accosts an individual and restrains his freedom to walk away, he has seized
> that person, and the Fourth Amendment requires that the seizure be reasonable.
>
> The reasonableness of seizures that are less intrusive than a traditional arrest
> depends on a balance between the public interest and the individual's right to
> personal security free from arbitrary interference by law officers. Consideration of
> the constitutionality of such seizures involves a weighing of the gravity of the
> public concerns served by the seizure, the degree to which the seizure advances
> the public interest, and the severity of the interference with individual liberty.
>
> A central concern in balancing these competing considerations in a variety of
> settings has been to assure that an individual's reasonable expectation of privacy
> is not subject to arbitrary invasions solely at the unfettered discretion of officers in
> the field. To this end, the Fourth Amendment requires that a seizure must be based
> on specific, objective facts indicating that society's legitimate interests require the
> seizure of the particular individual, or that the seizure must be carried out
> pursuant to a plan embodying explicit, neutral limitations on the conduct of
> individual officers.
>
> The State does not contend that appellant was stopped pursuant to a practice
> embodying neutral criteria, but rather maintains that the officers were justified in
> stopping appellant because they had a reasonable, articulate suspicion that a crime
> had just been, was being, or was about to be committed. We have recognized that
> in some circumstances an officer may detain a suspect briefly for questioning
> although he does not have probable cause to believe that the suspect is involved in
> criminal activity, as is required for a traditional arrest. However, we have required
> the officers to have a reasonable suspicion, based on objective facts, that the
> individual is involved in criminal activity.

The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct. Officer Venegas testified at appellant's trial that the situation in the alley 'looked suspicious,' but he was unable to point to any facts supporting that conclusion. There is no indication in the record that it was unusual for people to be in the alley. The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood. When pressed, Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity. The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees.

In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits."
(citations and quotations omitted)

189.   This case is almost a dead ringer for that one. Just replace the names of the people,

replace "alley" with "outside of apartment," and that case suddenly becomes interchangeable

with this one.

190.   An important exception to that rule was created in the case of *Hiibel v. Sixth Judicial*

*District Court of Nevada*, 542 U.S. 177 (2004), which held that statutes requiring suspects to

disclose their names during police investigations did not violate the Fourth Amendment if the

statute first required reasonable and articulable suspicion of criminal involvement. Under the

rubric of *Terry v. Ohio*, 392 U.S. 1 (1968), the minimal intrusion on a suspect's privacy, and the

legitimate need of law enforcement officers to quickly dispel suspicion that an individual is

engaged in criminal activity, justified requiring a suspect to disclose his or her name.

191.    However, that exception is not applicable here. Turley and Applegate did not, at first, believe Plaintiff was the suspect. They formed that belief because of Plaintiff's "evasive actions." In other words, Plaintiff suffered a direct negative consequence -- not because of circumstantial evidence, but as a direct consequence of Plaintiff exercising his Fifth Amendment right to silence. If Plaintiff had not exercised his Fifth Amendment right to silence, he would not have been arrested. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." See United States v. Goodwin, 457 US 368, 372 (1982). See also Bordenkircher v. Hayes, 434 US 357, 363 (1978) ("and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional").

192.    Keep in mind that these officers -- if the response from Chief Woodruff is to be believed -- were investigating a violation of a protection order. This is, most likely, a pretextual excuse made up to cover for the real excuse: Simply accosting Plaintiff for its own sake, most likely per Russel Rogers' previous advisement. Plaintiff reaches this conclusion for two reasons:

(a)    First, as you can tell from Section IV, Sub-Section 10 of this Single Complaint, the arrest report clearly shows that they had already caught the culprit by following the directions that Ms. North had given them. By doing that, they caught the culprit almost immediately. This directly contradicts Chief Woodruff's memorandum stating that "[Plaintiff]'s evasive actions caused them to believe he could be the suspect." They already knew exactly who the suspect was.

(b)    The second reason for this is because, even if they were still looking for the culprit, they would have had a perfectly viable alternative to dissolving Plaintiff of suspicion: Simply *asking Ms. North* the who complained about the protection order violation! Ask her if "that

guy" (pointing to Plaintiff) was her ex boyfriend, and she would respond in the negative,

clearing Plaintiff of any suspicion without forcing him to curb his Fourth and Fifth

Amendment rights!

193.    Even if the protective order case *wasn't* just made up in response to the grievance, they

were still required, under the doctrine of strict scrutiny, to try and figure out if Plaintiff was the

culprit *without* forcing Plaintiff to curb his Fourth and Fifth Amendment rights. The Fifth

Amendment right to silence, and the Fourth Amendment right to be free from suspicionless

search and seizure, are both fundamental rights, which means that violations of them must pass

strict scrutiny in order to be constitutional. *Graham v. Richardson*, 403 U. S. 365, 375-376

(1971); *Kramer v. Union School District*, 395 U. S. 621 (1969); *Shapiro v. Thompson*, 394 U. S.

618 (1969). To pass strict scrutiny, a violation must be the "least restrictive means" of achieving

their compelling interest. See Turner v. Safley, 482 US 78, 83 (1987). Plaintiff offered a

suggestion, in sub-paragraph (b) of the last paragraph, that would have instantly accomplished

the polices' goals (assuming they still had those goals in the first place; see sub-paragraph (a) of

the last paragraph for details there) without violating Plaintiff's 4th and 5th Amendment rights.

194.    Since the Harrison Police Department declined to sanction the officers for their conduct

on the grounds their conduct was within city policy, that means the entire city, not just individual

officers, should be held liable for their conduct. See *Monell v. New York City Dept. of Social

Servs.*, 436 US 658 (1978) (requiring an unconstitutional policy or custom in order for entire

municipal governments to be held liable).

195.    Therefore, Plaintiff has stated sufficient facts to recover on a § 1983 against the City of

Harrison, and also to recover against Sgt. Waldon and the two cops who almost arrested Plaintiff.

### SECTION VI: RELIEF REQUESTED

196.    Plaintiff requests the following relief:

#### Sub-Section 1: Injunction to cease and desist
#### any/all discrimination and retaliation

197.    First and foremost, Plaintiff asks that the State of Arkansas (and, by proxy, every agent

and officer within the State of Arkansas, and any local government subject to her jurisdiction)

permanently and perpetually cease and desist their adverse actions against Plaintiff unless they

can prove that their adverse actions are not a result of Plaintiff's disability or statutorily protected

activities.

198.    Any time an agent of the State, or any local government in Arkansas (including a judge)

commits any adverse action that A) is motivated, at least 0.00000001% in part, by Plaintiff's real

or perceived disabilities, or real or perceived statutorily protected activities, or B) has no

apparent motive behind it[15], that act should be considered a violation of this injunction, with

appropriate sanctions against the State of Arkansas to follow promptly, UNLESS the State shows

that they promptly enforced the law against the rogue officer, including without limitation the

awarding of restitution and compensation towards Plaintiff.

199.    An exception to this injunction can be had for the crime of Malicious Prosecution, Class

A Misdemeanor, which Plaintiff has already advised the Court about. As long as all of Plaintiff's

constitutional rights are accommodated, including but without limitation all of the following:

(a)     Plaintiff's right to *effective* assistance of counsel. An important keyword in this

requirement is "effective." Counsel who either acts lazy in handling Plaintiff's legal defense,

or who actually cooperates with the prosecutor to get Plaintiff convicted, are not "effective."

(b)     Plaintiff's right to have evidence entered against him ONLY if it complies

---

15 Without any apparent motive, we should assume that the motive is discrimination or retaliation.

substantially with the Rules of Evidence. Any attempts to circumvent the Rules of Evidence, with no underlying reason appearing for the noncompliance, should create a refutable presumption of discriminatory intent, much like in Footnote #14.

(c)     Plaintiff's right to confront the evidence against him through cross-examination. This would, obviously, include a bar against hearsay evidence unless the hearsay evidence substantially complies with the Rules of Evidence, as described above.

(d)     Plaintiff's right to have the frivolousness of the lawsuits tried by a jury of his peers (because whether the lawsuit was frivolous or malicious is an essential element, not a question of law). The Judges of this state have clearly demonstrated that they cannot be trusted to be fair or impartial, or use objective or reasonable standards, when determining whether Plaintiff's lawsuits are frivolous. It is clear that they are prepared to declare a lawsuit frivolous simply because they disagree with the lawsuit, even using other states' laws in order to create the illusion that their legal conclusions are legit.  Thus, since they cannot be trusted to exercise their authority responsibly, they should have that authority taken from them.

200.    In addition, Plaintiff asks that the State be ordered to implement a comprehensive, statewide anti-discrimination policy, which must include (without limitation) a means of *enforcing* this policy, beyond simply trusting the agents to follow the law or restricting remedies for violations thereof to an appeal alone.  The enforcement provisions of this policy must provide for actual *consequences* for violating it, including potential incarceration.

### Sub-Section 2: Injunction to reinstate all rights of Plaintiff

201.    Plaintiff asks for retrospective injunctive relief to the following extents:

(a)     All orders – including judgments – issued in any of Plaintiff's cases by either Russel Rogers or Brad Karren should be nullified.

(b)     Plaintiff's court access rights in the Boone County Circuit Court be fully reinstated.

(c)     Any/all records of Plaintiff's conviction must be nullified.

202.    Any other adverse actions that were fueled, even the tiniest bit, by Plaintiff's real or perceived litigation history and/or real or perceived disabilities must also be nullified.

203.    When reopening cases, they must be ordered to assign a judge who will not hold any sort of vendetta against Plaintiff for his real or perceived statutorily protected or his real or perceived disabilities. It is imperative that they not merely assign a judge who will take the oath not to (after all, trial judges already take an oath to support the Constitution[16], which, by proxy, includes the absolute constitutional right to an impartial judge, so clearly, they do not hold any "oath" they take in any regard). Rather, the State should have to *prove* (not just claim, but *prove*) that any actions in those cases that are adverse to the Plaintiff were not motivated, even slightly, by discrimination or retaliation.

(a)     In other words, due to the clearly-established vendetta that the State holds against Plaintiff (because, at this point, after all they've done, there really can be no denying that the entire state has a bias against Plaintiff), they should hold the burden of proof that their judges' official reasons for ruling against Plaintiff are NOT pretextual, rather than Plaintiff having to prove that they are.

204.    They should also be ordered to pay Plaintiff pre-judgment interest on those cases while the Administrative Office of the Courts is assigning judges to them. This would give the Administrative Office an incentive to assign judges – *qualified* judges – as fast as possible, rather than procrastinating and preventing Plaintiff from receiving justice in those cases by simply not allowing the cases to move forward.

---

16 Ark. Const. Art. 19, § 20

205.    Because of the impracticality and near impossibility of the standard enunciated in the

previous two paragraphs, the Court may agree with Plaintiff that a damages package is probably

the best relief (in much the same way that courts, in employment discrimination cases, may

choose to award "front pay" rather than order reinstatement of the Plaintiff to his previous

position, if it detects mutual, incurable hostility from the defendant/employer to the

plaintiff/employee).  This transitions us to the next sub-section ...

### Sub-Section 3: $11,000,000 for loss of Case No. CV2012-85-4

206.    The causes of action listed in Section IV, Sub-Sections 5-12 all collectively played a role

in Plaintiff losing that case.  As much as Goldie would love to have everyone believe that

Plaintiff would have lost his case anyway, the simple bottom line is that, if that were indeed the

case, Goldie would have had no need to conduct *ex parte* communications.

207.    Plaintiff asks that David D. Stebbins, James E. Goldie, Russel Rogers, Kristie Williams,

the State of Arkansas, the Administrative Office of the Courts[17], Jim Hannah[17] , and Donna Gay[17]

all be jointly liable for the $11,000,000 that their actions (which they did not even TRY to cover

up) cost Plaintiff.

### Sub-Section 4: Damages for loss of Case No. CV2015-38-4

208.    Plaintiff was suing, in that case, for an at-the-time unknown amount. Therefore, Plaintiff

cannot give an exact amount, here. However, he does not have to; the injunctive relief and

damages that he is already requesting is enough to get the Defendants to file an Answer, and as

long as they do that, Plaintiff can recover whatever amount he is entitled, even if he didn't

request it in the pleadings. See Fed.R.Civ.P. 54(c).

209.    If Brad Karren's order dismissing the case with prejudice, and his order barring Plaintiff

---

17 These entities should be jointly liable because, were it not for their policy of not conducting any investigation
into whether the special judge is qualified, Plaintiff would likely have gotten a judge who was qualified (namely,
a judge that would not hold things against Plaintiff that were not illegal).

from filing any further *pro se* pleadings in the Boone County Circuit Court, can be proven to have been motivated, at least 0.0000000000000000000000001% in part, by Plaintiff's statutorily protected activities, Plaintiff asks that Brad Karren, the Administrative Office of the Courts, Jim Hannah, and Donna Gay be liable for whatever amount of damages Plaintiff might have recovered in that case.

### Sub-Section 5: $1,500,000 for emotional distress

210. After the jury unanimously rendered a verdict in David D. Stebbins' favor, Plaintiff, feeling that there was no justice in the world, retired to his apartment, expecting to never leave that place. Why, you ask? Because as soon as he got home, he took off his shirt and proceeded to ingest and entire Powerade bottle full of bleach. He did not WANT to live in a world where judges could simply ignore the law if they felt like it.

211. To make a long story short, Plaintiff's life was saved. He was taken to a hospital in Jonesboro and diagnosed with Clinical Depression.

212. Since then, Plaintiff has underwent increasing amounts of stress, as various government agents, rather than feeling bad about what they did to Plaintiff, see it as a sign that they were right all along, that Plaintiff is mentally unstable, completely ignoring the fact that this is a self-fulfilling prophecy.

213. The Defendants' actions drove Plaintiff to a literal suicide attempt, and they only increased these actions after Plaintiff was discharged from the hospital. As a result, Plaintiff believes that one and a half million dollars is well within the bounds of reason.

214. These damages can also be shared among all Defendants who are found liable for them.

### Sub-Section 6: $10,000,000 in punitive damages from
### each person, for each cause of action

215.    These people have no humanity in them. They don't care about anything except the

bottom line. They don't care about anything except winning.

216.    These people are not going to get the message, just on an injunction alone.  Thus, even if

this Court believes that the granting of the injunctive relief requested in Section VI, Sub-Section

2 of this Single Complaint would nullify the damages requested in Sub-Sections 3 & 4, Plaintiff

still requests independent exemplary damages against each person for each cause of action they

are held against.

217.    This is the only way to make them really pay attention.

### Sub-Section 7: $100,000,000 in punitive damages from
### the State of Arkansas & Administrative Office of the Courts, for each cause of action

218.    The State of Arkansas, as a whole, is largely responsible for what happened. It is their

policy of granting their officials immunity from the law.  Not just immunity from suit, but also

*de facto* (if not *de jure*), the state offices which are responsible for enforcing government

accountability through means other than civil litigation (such as the Office of Professional

Conduct, or the Judicial Discipline and Disability Commission) will always side with the

government agent over the citizen, 100% of the time.

219.    The State of Arkansas does not have any sort of comprehensive anti-discrimination

policy, and even if they have one on paper, it is never followed.  Even if the have one on paper, it

most likely does not provide for any sort of consequences for not following it.

220.    In addition to being enjoined to create such a policy, Plaintiff asks that the State be issued

ten times the punitive damages of an individual, since it was the collective efforts of ALL

policymaking officials in the State of Arkansas (including the Governor and General Assembly)

that lead the individual defendants to believe that their conduct would go unpunished.

221.    The Administrative Office of the Courts should similarly be held liable for ten times the punitive damages as the individuals because, again, it is their total lack of a comprehensive anti-discrimination policy that lead to people like Rogers and Karren getting appointed.

222.    This is necessary to send a message to the Defendants that following federal law is not optional.

### Sub-Section 8: $250 for each day of increased government surveillance (beginning on July 2, 2015).

223.    In addition to the punitive damages requested in Sub-Section 6, Plaintiff asks for $250 for each day that goes by until both David Etheridge and the Boone County Department of Human Services certify, in writing, that they are withdrawing their increased surveillance of Plaintiff's activities.

224.    Plaintiff believes that this is a reasonable amount, as such an amount has been upheld before in the 8th Circuit. See *Maxwell v. Mason*, 668 F.2d 361, 365-66 (8th Cir. 1981) (compensatory damages of $100 per day for intangible injuries not excessive or arbitrary). That case was published in 1981, and since then, inflation has caused $100 in 1981 to have the buying power of $262.53 in 2015. See the federal government's inflation calculator at http://www.bls.gov/data/inflation_calculator.htm. Thus, Plaintiff believes that damages of $250 per day is a reasonable amount.

### Sub-Section 9: $1,000 for each day of deprived court access

225.    Because Plaintiff is denied justice because access to the courts has become prohibitively expensive, Plaintiff asks for damages against Brad Karren, the State of Arkansas, the Administrative Office of the Courts, Jim Hannah, and Donna Gay in the amount of $1,000 per

day, starting on August 4, 2015, that Plaintiff's court access rights are taken from him.

226.    Plaintiff seeks four times the daily amount he seeks in the previous Sub-Section because A) this is a much more direct violation, and B) this is a *fundamental* right, and therefore, deserves greater protection than ordinary rights.

### Sub-Section 10: $1,000 for each day Webb does not withdraw his gag order

227.    Just as Karren should be liable for $1,000 for each day Plaintiff's fundamental rights are restricted, so too should Gordon Webb. He unlawfully restricted Plaintiff's right to free speech, for no other reason than he doesn't like Plaintiff. Every day that he does not withdraw this gag order should cost him $1,000.

### Sub-Section 11: $1,000 for each day the City of Harrison does not modify its "police conduct" standards, and $2,000 punitive damages per day from each Defendant

228.    Plaintiff is now living in constant fear. The Harrison Police Department has demonstrated that they are willing to arrest Plaintiff at the drop of a hat. What's next? Will they arrest him if he does not submit to a full-body cavity search ... on the sidewalk, in front of everyone? Will they arrest him if he does not allow them to place keylogger software on his computer so they can monitor everything he does, both online and off? Sure, those acts would be patently unconstitutional, but then again, so was this act! Not to mention ... the crime they were about to arrest Plaintiff for wasn't even technically a crime in the State of Arkansas! So, they obviously don't think they need a statute from the General Assembly before they can arrest you!

229.    Plaintiff asks, for his initial damages demand[18], damages of $1,000 per day, from the City of Harrison, the three unknown-named police officers, and Russel Rogers (more on him in the next paragraph), for the stress he is suffering as a result of this altercation. Those damages can be

---

18 Because remember: As long as there is no default judgment, Plaintiff may recover whatever damages he's entitled. So this is subject to change unless the Defendants choose not to respond.

shared by all defendants who are found to be partially at fault. Plaintiff also demands separate,

unshared damages of $2,000 per day from each defendant, to punish them for attempting to

arrest a person for a non-existent law that already, more than three decades ago, been declared

unconstitutional, even if it existed.

230.    The reason Plaintiff asks for Rogers to be jointly liable is because, as stated at the

beginning of Section IV, Sub-Section 10, he believes that this is a specific instance of the sort of

"increased government surveillance" that was caused by Rogers' personal capacity malicious

prosecution and defamation actions. If the two acts can be proven to be even remotely tied

together, Plaintiff has the right to enforce the damages award against Rogers just as much as

against the other three unknown-named police officers.

231.    In fact, that is the reason Plaintiff is suing the City of Harrison in this Court, rather than

the Western District. He believes that this is connected to Russel Rogers' activities, thus

invoking this Court's supplemental jurisdiction!

232.    Plaintiff is entitled to recover punitive damages in this case because their actions

amounted to a reckless and callous disregard of Plaintiff's 4th and 5th Amendment rights. See

*Trobaugh v. Hall*, 176 F. 3d 1087, 1089 (8th Cir. 1999) ("Further, we ask the District Court to

reconsider awarding punitive damages against Hall. The undisputed evidence showed that Hall

deliberately punished Trobaugh for exercising his First Amendment right to submit grievances

and successfully intimidated Trobaugh from filing further grievances. This conduct amounted to

reckless or callous indifference to Trobaugh's First Amendment right to submit grievances, and

may call for deterrence and punishment over and above that provided by a compensatory

award").

### SECTION VII: JURY DEMAND

233.   Plaintiff demands a jury trial.

## SECTION VIII: PROMISE OF WHAT TO DO WITH THIS MONEY

234.   Plaintiff is not seeking to get rich. Quite the opposite. He is seeking to teach the government that it is not above the law.

235.   If it is any consolation to the Court, and if it helps ease the courts concerns about Plaintiff's true intentions, he is willing to submit an affidavit, under oath, to the following effect:

(a)   If Plaintiff wins more than $1,000,000 in this case, he will pledge at least 90% of any damages collected above $1,000,000, that are not directly tied to a direct, tangible expense Plaintiff has suffered to a charity of Plaintiff's choosing, within one (1) year of collecting on the judgment.

(b)   For purposes of determining what damages are "not directly tied to direct, tangible expense," Plaintiff will defer to the IRS's standards as to what types of damages are normally subject to an income tax, if they were not pledged to charity and thus were not subject to the corresponding tax deduction.

236.   Plaintiff is in the hopes that this promise – and his offer to make it under oath if necessary – would help to ease the Court's conscience that Plaintiff is not simply seeking to get rich quick, like what the Defendant in *Shaver v. Independent Stave Co.*, *supra* alleged (though Plaintiff would like to politely remind the Court that, even if that were Plaintiff's goal, that still would not bar Plaintiff's entitlement to recovery, as per the *Shaver* precedent). Hopefully, this will entice the Court to be a bit more compassionate towards Plaintiff's plight.

## SECTION IX: CONCLUSION

237.   The government (and, by "government," Plaintiff means the State of Arkansas and ALL her officers! Every last one of them, not just those who are implicated in this case) consider

themselves above the law. They believe that Plaintiff only has rights if they say he does. They think that they can do whatever they want to Plaintiff, because they have sovereign immunity. They need to be taught that they are not above the law, and damages are the only way to do so.

238.    Wherefore, premises considered, Plaintiff respectfully prays that the relief requested in Section VI of this Complaint be granted in its entirety, costs incurred be awarded, his $200 bond be refunded, and any other relief to which Plaintiff may be entitled.

239.    So requested on this, the 24th day of August, 2015.

David Stebbins
123 W. Ridge
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

## EXHIBIT A, PART 1: CHART OF WHO IS BEING SUED FOR WHAT

| | Jim Hannah | Donna Gay | State Of Arkansas | Arkansas Administrative Office Of The Courts | Russell Rogers | David D. Stebbins | James Goldie | Kristie Williams | Gordon Webb | Brad Karren | Wes Bradford | City of Harrison | Robert Turley | Josh Applegate | Sgt. Waldon |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADA Retaliation #1 (criminal charges maintained (and possibly initiated) in retaliation against litigation history) | | | ✔ | | | | | | | | ✔ | | | | |
| ADA Retaliation #2 (Goldie & David D. Stebbins sought bar of court access in response to litigation history) | | | | | | ✔ | ✔ | | | | | | | | |
| ADA Retaliation #3 (Russel Rogers adverse rulings due to litigation history) | ✔ | ✔ | ✔ | ✔ | ✔ | | | | | | | | | | |
| ADA Retaliation #4 (Brad Karren adverse rulings due to litigation history) | ✔ | ✔ | ✔ | ✔ | | | | | | ✔ | | | | | |
| Title II ADA Discrimination #1 (criminal charges were maintained (and possibly initiated) in response to perceived mental disability) | | | ✔ | | | | | | | | ✔ | | | | |
| Title II ADA Discrimination #2 (Russel Rogers adverse actions due to perceived mental health issue) | ✔ | ✔ | ✔ | ✔ | ✔ | | | | | | | | | | |
| Personal Capacity Malicious Prosecution | | | | | ✔ | | | | | | | | | | |
| Personal Capacity Defamation | | | | | ✔ | | | | | | | | | | |
| § 1983 claim (ex parte communications) | | | | | | ✔ | ✔ | ✔ | | | | | | | |
| § 1983 claim (bar of court access in complete absence of jurisdiction) | | | | | | | | | | | ✔ | | | | |
| Perjury No. 1 (Lying about lack of memory of night of arrest) | | | | | | ✔ | ✔ | | | | | | | | |

### EXHIBIT A, PART 2: CHART OF WHO IS BEING SUED FOR WHAT (cont.)

| | Jim Hannah | Donna Gay | State Of Arkansas | Arkansas Administrative Office Of The Courts | Russell Rogers | David D. Stebbins | James Goldie | Kristie Williams | Gordon Webb | Brad Karren | Wes Bradford | City of Harrison | Robert Turley | Josh Applegate | Sgt. Waldon |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perjury No. 2 (Lying about Plaintiff's bargaining power) | | | | | | ✔ | ✔ | | | | | | | | |
| Perjury No. 3 (he doesn't drive) | | | | | | ✔ | | | | | | | | | |
| Perjury No. 4 (he attended the AA session) | | | | | | ✔ | | | | | | | | | |
| Perjury No. 5 (driver's license costs a lot) | | | | | | ✔ | | | | | | | | | |
| Perjury No. 6 (drinking habits) | | | | | | ✔ | | | | | | | | | |
| Perjury No. 7 (rate at which alcohol leaves the human body) | | | | | | ✔ | | | | | | | | | |
| Perjury No. 8 (Bradford lying of lack of knowledge) | | | | | | | | | | | ✔ | | | | |
| Perjury No. 9 (Webb lying about lack of off-the-record knowledge) | | | | | | | | | ✔ | | | | | | |
| Tampering with Physical Evidence | | | | | | | | ✔ | | | | | | | |
| § 1983 claim for First Amendment Censorship | | | | | | | | | ✔ | | | | | | |
| § 1983 claim for near-arrest for exercising Fourth and Fifth Amendment rights | | | | | ✔ | | | | | | | ✔ | ✔ | ✔ | ✔ |